2005 WL 1241919 (S.D.N.Y.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

WOMEN'S INTERART CENTER, INC. Plaintiff,

v.

NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION (EDC), Andrew M. Alper, President of EDC; Jerilyn Perine, Commissioner, Department of Housing Preservation and Development; City of New York; Daniel Doctoroff, Deputy Mayor, City of New York; and Michael Bloomberg, Mayor, City of New York, Defendants.

No. 03Civ.2732DABRLE.

May 23, 2005.


OPINION


BATTS, J.

**\*1** Plaintiff Women's Interart Center, Inc. ("WIC") brings this action asserting various federal constitutional, New York State constitutional, and common law claims against Defendants arising out of the termination of WIC's real estate sale and development contract with Defendant New York City Economic Development Corporation (EDC) in December 2002. Defendants now move to dismiss the entire action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, or, in the alternative, to dismiss Plaintiff's two federal constitutional claims pursuant to F.R.C.P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons stated below, Defendants' motion is GRANTED IN PART AND DENIED IN PART.

I. PROCEDURAL HISTORY

WIC commenced the present action on April 18, 2003, asserting two claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments of the United States Constitution, as well as claims for breach of contract, tortious interference with contractual performance, promissory estoppel, and violations of the free speech, right to petition, and equal protection clauses of the New York State Constitution. WIC seeks compensatory and punitive damages and an injunction directing Defendants to (1) apply for extensions to federal funding they had secured on WIC's behalf, (2) complete the sale of 549-551 West 52nd Street in Manhattan (hereinafter the "Building") and certain adjacent vacant property to WIC (collectively the "Property") to WIC, and (3) commence eviction proceedings against Ensemble Studio Theater ("EST") and certain other Building tenants. (Complaint ["Compl."] ¶¶ 110-162).

The § 1983 claims are the only ones at issue in the present motion. WIC's First Amendment claim alleges that Defendants' mistreatment of it by thwarting efforts to relocate certain Building tenants, repeatedly raising the bar for transfer of the Property to WIC, and manufacturing unreasonable grounds for terminating the Property Sale Contract--was in retaliation for WIC's exercise of its rights to free speech and to petition the government for redress of grievances. (Compl.¶¶ 110-113). WIC's Fourteenth Amendment claim alleges that, by mistreating WIC in this way, Defendants treated it more adversely than similarly situated Building tenantsnamely ESTsolely because of an "irrational hostility" towards WIC, thereby violating WIC's right to equal protection of the laws. (*Id.* ¶¶ 130-131).

On June 19, 2003, WIC moved for a temporary restraining order requiring Defendants to apply for HUD funding extensions and prohibiting Defendants from selling, leasing, or

otherwise encumbering the Property during the pendency of the present lawsuit, and an order to show cause why a preliminary injunction should not issue. (Proposed Order to Show Cause with Temporary Restraining Order, dated June 19, 2003). At a hearing held on the same day, this Court declined to grant WIC the interim relief it sought unless and until the Court determined that the federal claims upon which jurisdiction in this case is anchored were in fact viable. (Transcript of Proceedings held June 19, 2003 ["Tr."] at 41). The Court therefore ordered the parties to engage in expedited discovery for a period of twenty days limited to issues surrounding WIC's federal claims, after which Defendants would be permitted to move to dismiss the present action. (*Id.* at 41, 66). In addition, the Court directed Defendants to "maintain the status quo" with respect to disposition of the Property until the jurisdictional issues were resolved. (*Id.* at 58).

**\*2** Thereafter, at a telephone conference with the parties held on July 1, 2003, the Court extended the discovery deadline to August 8, 2003. However, numerous discovery disputes then arose between the parties, which prolonged discovery for several months. On September 26, 2003, the Court referred these disputes to United States Magistrate Judge Ronald Ellis for resolution.

On February 4, 2004, while these disputes were still pending before Judge Ellis, WIC wrote to the Court requesting that it be permitted to move for a preliminary injunction before the completion of discovery. By Order dated February 11, 2004, the Court denied WIC's request, specifying that "once the discovery disputes currently before Judge Ellis are resolved and discovery is complete, the next order of business will be to set a schedule for Defendants to make their motion to dismiss," and that "the Court will not rule on any motion for preliminary injunction by Plaintiff unless and until Defendants' motion to dismiss is denied." (Order, dated February 11, 2004, at 1). Nevertheless, WIC filed a motion for preliminary injunction on February 26, 2004, while the parties' discovery disputes were still pending before Judge Ellis. On July 20, 2004, Judge Ellis issued an order resolving the remaining discovery disputes in the case. (*See* Order of Magistrate Judge Ronald Ellis, dated July 20, 2004). Thereafter, on August 12, 2004, this Court issued an Order striking WIC's preliminary injunction motion without prejudice and setting a briefing schedule for Defendants' motion to dismiss. (Order, dated August 12, 2004, at 3, 5). Defendants' motion was fully-submitted to this Court on October 28, 2004.

II. FACTUAL BACKGROUND [FN1]

FN1. Ordinarily, where, as here, defendants have moved to dismiss under Rule 12(b)(1) on grounds of insubstantiality of federal claims and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the Court's examination of the factual record is limited to the allegations contained in the Complaint. *See Giulini v. Blessing,* 654 F.2d 189, 192 (2d Cir.1981); *Rombach v. Chang,* 355 F.3d 164, 169 (2d Cir.2004). However, because, as discussed in Part III.B. *infra,* the Court converts Defendants' Rule 12(b)(6) motion into a motion for summary judgment, the following facts are also taken from the affidavits, deposition transcripts and other documentary evidence submitted by the parties in connection with the present motion. *See* Fed.R.Civ.P. 56(c) ( "[Summary judgment] shall be rendered forthwith if the *pleadings, depositions, answers to interrogatories, and admissions on file, together*

*with the affidavits, if any,* show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (*emphasis added* ).

A. WIC's Opposition to the City's CURA Development Plans

In July 1971, WIC, a New York non-profit corporation founded in 1969 to promote the arts in the Clinton/Hells Kitchen neighborhood of Manhattan, became the first cultural tenant to move into the Building. (Compl. ¶¶ 9, 19-20; Declaration of Marguerite A.L. Lewitin ["Lewitin Decl."] ¶¶ 3-5). The Building is part of a six-block area running from 50th to 56th Streets between 10th and 11th Avenues in Manhattan, which was designated by Defendant the City of New York ("City") as the "Clinton Urban Renewal Area" (CURA) in 1969. (Compl. ¶ 21; Lewitin Decl. ¶ 6). Like most of the properties within the CURA, the Building is owned by the City and administered by the City's Department of Housing Preservation and Development ("HPD"), the agency responsible for urban renewal within New York City, including the CURA. (Lewitin Decl. ¶ 6; Deposition of Jerilyn Perine ["Perine Dep."] at 21).

In the mid-1980's, WIC joined other CURA residents in opposing the City and HPD's efforts to develop parts of the CURA in a manner they felt was environmentally unsound and would likely drive away many of those they considered to be CURA's vital residents. (Compl. ¶ 23; Lewitin Decl. ¶ 6). As a member of the board of the Clinton Preservation Local Development Corporation ("CPLDC"), WIC participated in commissioning and promoting a comprehensive alternative development plan for the CURA designed to preserve the existing residents by not requiring the demolition of existing reusable buildings. (Compl. ¶ 24; Lewitin Decl. ¶ 6). In addition, in 1987, WIC and CPLDC publicly opposed a City/HPD proposal to develop a homeless shelter in one of the CURA's buildings which would have required the eviction of six small businesses in the area, petitioning state and local legislative bodies to halt the project and speaking out against it in the local press. (Lewitin Decl. ¶ 21, Ex. 1 (Local Newspaper Articles from 1987 discussing WIC's opposition to the proposal)).

*3 WIC and the CPLDC also filed three lawsuits during this time period against the City and several of its agencies, including HPD, challenging various aspects of the City's CURA development efforts. The first suit, *Clinton Preservation Local Development Corp. v. City of New York,* No. 41863/85 (Sup.Ct.N.Y.Co.1985), commenced in May 1985, challenged the selection of development proposals for sites 8 and 9C, and the intended disposition of site 7, in the CURA. (Compl. ¶ 25; Lewitin Decl. ¶ 7; Affidavit of Jerilyn Perine ["Perine Aff."] ¶ 5, Ex. A (Complaint filed in *CPLDC v. City of New York,* at 1-4)). WIC, a tenant of the Building, which was located on site 7B of the CURA, was not a named party to this action. (Perine Aff. ¶ 5 n.1, Ex. A). The second action, *Women's Interart Center, Inc. v. Gliedman,* No. 23511/85 (Sup.Ct.N.Y.Co.1985), commenced in September 1985, was an Article 78 proceeding challenging then HPD Commissioner Anthony Gliedman's refusal to sell the Building to WIC as well as HPD's submission of various proposed CURA residential development projects for land use and environmental review and approval. (Compl. ¶ 25; Perine Aff. ¶ 6, Lewitin Decl. ¶ 7). On March 24, 1986, the New York Supreme Court dismissed the refusal-to-sell claim as time-barred and insufficient as a matter of law and the other claims as premature, a decision that was affirmed by the New York Appellate Division, First Department. (Perine Aff. ¶ 7, Ex. D (New York Supreme Court's decision in *WIC, Inc. v. Gliedman,* dated March 24, 1986)); *see also Women's Interart Center, Inc. v. Gliedman,* 131 A.D.2d 984, 516 N.Y.S.2d 1003 (N.Y.App. Div. 1st Dep't 1987). Finally, *Women's Interart Center, Inc. v. New York City Dept. of Environmental Protection (DEP),* No. 4461/86 (N.Y.Sup.Ct.1986), commenced in February 1986, challenged the DEP's finding that a proposed Second Amended CURA plan would not have a significant environmental impact. (Compl. ¶ 25; Perine Aff. ¶ 8; Lewitin Decl. ¶ 7). WIC subsequently withdrew the lawsuit as moot in April 1986 when then New York City Mayor Ed Koch withdrew the proposed amendment to the CURA development plan from consideration by the Board of Estimate. (Perine Aff. ¶ 8, Ex. E (New York Supreme Court Order in *WIC v. DEP,* dated April 21, 1986); Lewitin Decl. ¶ 8).

In March 1986, while these lawsuits were still proceeding in New York State courts,

Defendant Jerilyn Perine began her employment with HPD as Director of Manhattan Planning in HPD's Office of Development. (Perine Aff. ¶¶ 10-11; Perine Dep. at 11; Lewitin Decl. ¶ 17). By the time Perine was hired, however, HPD had already completed the bulk of its work on the CURA plan. Perine was not involved in formulating any of the CURA development proposals or proposed CURA plan amendments that were challenged in the three WIC/CPLDC lawsuits. (Perine Aff. ¶¶ 10, 13; Perine Dep. at 18, 21-22). Moreover, while she was generally aware at that time of litigation challenging various aspects of the CURA plan, Perine alleges she did not know the specifics of these three lawsuits, nor was she aware then or at any time prior to commencement of the present case that WIC was a party to any of them. (Perine Aff ¶ 9).

B. Landlord-Tenant Disputes between WIC and the City/HPD

*4 Perine first became aware of WIC some time after June 1987, when, as Director of Program Management in HPD's Office of Property Management (OPM), she was informed of a problem with one of the elevators in the Building. (Perine Aff. ¶ 15; Perine Dep. at 12, 22-23, 32; Lewitin Decl ¶ 17). The broken elevator was in turn allegedly only one of several problems with the Building's safety and habitability that arose over the next decade and ahalf, many of which [FN2] WIC repeatedly tried to bring to HPD's attention. (Lewitin Decl. ¶ 10).

> FN2. These problems included a lack of a working water tower for fire safety, repeated flooding and water damage due to a defective roof and skylight, malfunctioning radiators, broken windows, and a broken boiler in the middle of winter. (Lewitin Decl. ¶¶ 10-12).

Beginning as early as 1985, WIC, allegedly at the suggestion of HPD property managers, often made its own repairs and then withheld rent for the amount it had spent on them. Alternatively, WIC made no repairs and simply withheld the rent on grounds that the City and HPD had breached the warranty of habitability. [FN3] (Lewitin Decl. ¶¶ 14, 25).

> FN3. The implied warranty of habitability does not apply to commercial spaces. *See,* N.Y. Real Property Law § 235-b (specifying that the warranty is applicable to "every written or oral lease or rental agreement for *residential premises"* ) (*emphasis added* ); *Polak v. Bush Lumber Co.,* 170 A.D.2d 932, 933, 566 N.Y.S.2d 757 (3d Dep't 1991) ("A landlord is not bound by statutory covenant or warranty of habitability where commercial nonresidential rental property is involved."); *Mansions v. Moe's Pizza,* 149 Misc.2d 43, 44, 561 N.Y.S.2d 331 (N.Y. City Civ.Ct.1990) ("The warranty of habitability contained in Real Property Law § 235-b is applicable only to residential tenants.").

The City and HPD responded to WIC's withholding of rent by initiating several non-payment/eviction proceedings against WIC. The first, commenced in 1988, was subsequently settled in August of 1989. Under the terms of the settlement, WIC agreed to pay the City $80,690.91 in back rent owed from June 1, 1984 through March 31, 1989 in return for being permitted to continue as a tenant in the Building. (Lewitin Decl., Ex. 30 at D 1690, 1703-1708).

In 1991 WIC filed a notice of claim and then a civil lawsuit against the City/HPD in New York County Supreme Court based on damage to WIC's space and equipment due to flooding caused by debris on the Building's roof that the City/HPD had allegedly promised but failed to remove. (Lewitin Decl. ¶ 15; Compl. ¶ 39; Affidavit of Harold

Weinberg ["Weinberg Aff."] ¶¶ 5-6, Exs. A and B). Thereafter, in 1992, HPD initiated two more non-payment proceedings, both of which were subsequently discontinued. (Lewitin Decl., Ex. 30 at D 1690; Weinberg Aff. ¶ 8 n.4). In each of these cases, WIC asserted affirmative defenses and counterclaims based on property damage allegedly caused by the Building's aforementioned disrepair. (Weinberg Aff. ¶ 8; Lewitin Decl. ¶ 14).

The City/HPD and WIC also litigated the latter's withholding of rent for space it leased in another CURA building, 552 West 53rd Street (the "Old School Building"). In late 1992, the City/HPD commenced a non-payment action against WIC for $5,345.00 in back rent that WIC owed from February 1991 through December 1992. (Weinberg Aff. ¶ 16, Ex. Q (Petition filed in *City of New York v. Women's Interart Center, Inc.,* No. 27820/92 (New York City Civ.Ct.1992))). WIC asserted affirmative defenses and counterclaims based on property damage and the City/HPD's failure to make repairs. [FN4] (*Id.* ¶ 16, Ex. Q at C2851-2853 (WIC's Answer in *City v. WIC,* 27820/92)). In April 1993, the parties reached a stipulation of settlement, under which WIC agreed to pay $6,075.00 in rent owed through April 30, 1993. (*Id.* ¶ 16, Ex. Q at P2850 (Stipulation of Settlement in *City v. WIC,* 27820/92)).

> FN4. The repairs allegedly needed included a malfunctioning toilet, lack of water and failure to make timely repairs to the roof. (Weinberg Aff. ¶ 16, Ex. Q at C2851-2853).

**\*5** In 1993, HPD commenced a fourth eviction proceeding against WIC, this time for WIC's non-payment of $25,130.00 in Building rent owed through November 1992, and WIC again asserted affirmative defenses and counterclaims for damages allegedly based on the City/HPD's failure to make various repairs to the Building. (Perine Aff. ¶ 17 n.5, Ex. H; Weinberg Aff. ¶ 8 n.4, Ex. F (WIC's Verified Answer in *City of New York v. Women's Interart Center, Inc.,* No. 12429/93 (New York City Civ.Ct.1993))). That same year, WIC filed another notice of claim against the City for $50,000.00 of "property damage and interruption of business caused as a direct result of a broken heating pipe and broken window at [the Building]." (Weinberg Aff. ¶ 7, Ex. C).

In June of 1993, the parties entered into a Court-ordered Stipulation of Settlement under which WIC received a credit of six months rent and waiver of late charges for its affirmative defenses and counterclaims and in return agreed to pay off the remaining owed back rent through monthly installments by June 1994, while HPD agreed to make various repairs to the Building. (Perine Aff. ¶ 17 n.5, Ex. H at P2622-2624 (Stipulation of Settlement in *City of New York v. Women's Interart Center, Inc.,* dated June 14, 1993); Weinberg Aff. ¶ 9, Ex. G). However, WIC defaulted on its stipulated payments in November 1993, after which HPD obtained a seventy-two hour eviction warrant. (Perine Aff. ¶ 17 n.5). WIC then moved to vacate the stipulation and restore the proceeding to calendar because HPD had not made the agreed-upon repairs. (*Id.* ¶ 17 n.5, Ex. H at P2614-2615). After the Civil Court judge denied WIC's motion, WIC again began making rent payments in December 1993 but thereafter only made sporadic payments over the next two years. (*Id.*).

In February 1995, the City/HPD filed another non-payment petition against WIC for rent owed in the Old School Building from June 1994 through February 1995. This was subsequently discontinued in June of 1995. (Weinberg Aff. ¶ 16, Ex. R (Petition filed in *City of New York v. WIC,* No. 12362/95 (New York City Civ.Ct.1995))). Thereafter, in late 1995/early 1996, OPM decided to close the Old School Building because of poor health and safety conditions and the state of the heating plant. It ordered all tenants, including WIC, to vacate. (*Id.* ¶ 17). One of the tenants, the Medicine Show Theatre Ensemble, Inc. ("Medicine Show") initially refused to vacate. During eviction proceedings, HPD discovered that Medicine Show had actually been subletting space in

the building from WIC. This was in violation of WIC's lease with the City/HPD which specifically prohibited subleasing. (*Id.;* Perine Dep. at 38-40; Perine Aff. ¶¶ 19-20, Ex I). [FN5]

> FN5. Medicine Show then began sending rent checks directly to HPD in an effort to forestall its eviction. (Weinberg Aff. ¶ 18). Ultimately, the City/HPD commenced an eviction proceeding against Medicine Show in New York City Civil Court in 1998, which ultimately led to a stipulation of settlement pursuant to which Medicine Show vacated the Old School Building on July 3, 1998. (*Id.* ¶ 18, Ex. X (Stipulation of Settlement in *City of New York v. Medicine Show,* No. 11944/98 (New York City Civ.Ct.1998))). The City eventually relocated Medicine Show to the third floor of the Building. (*Id.* ¶ 18).

In January 1996, the WIC and the City/HPD restored the 1993 Building non-payment action to the Civil Court's calendar in order to enter into a new stipulation of settlement under which WIC agreed to pay off in installments by November 1996 the $24,239.06 in back rent it owed through January 1996; WIC's obligation to pay was not conditioned upon HPD's making repairs in the Building. (Perine Aff. ¶ 17 n.5, Ex. I at P2628-2629 (Stipulation of Settlement in *City of New York v. Women's Interart Center, Inc.,* No. 12429/93, dated January 31, 1996)). However, WIC again defaulted on its rental payments and then brought an order to show cause in December 1996 seeking to vacate the stipulation and stay eviction again because of the City/HPD's failure to make certain repairs to the Building. (*Id.* ¶ 17 n.5, Ex. H at 2614-2620; Weinberg Aff. ¶ 12, Ex. N). Shortly thereafter, in December 1996, WIC filed a third notice of claim and civil lawsuit against the City/HPD in New York County Supreme Court, alleging property damage and lost business opportunities due to the Building's disrepair. (Weinberg Aff. ¶¶ 14-15, Exs. O and P.). The Civil Court refused to vacate the stipulation in the non-payment proceeding but stayed eviction twice, until December 31, 1996 and then until February 10, 1997. (*Id.* ¶ 17 n.5, Ex. H at 2631 (Order of New York City Civil Court in *City of New York v. Women's Interart Center, Inc.,* No. 12429/93, dated November 12, 1996); Weinberg Aff. ¶¶ 12 n.13, 13, Ex. M).

*\*6* Perine first became personally involved with WIC's rent withholding disputes with the City/HPD just prior to a February 6, 1997 meeting between HPD and WIC representatives to resolve the on-going non-payment dispute. (Perine Dep. at 23-24, 29). While preparing for this meeting, Perine learned that HPD had an on-going non-payment proceeding against WIC for the latter's nonpayment of "significant rent arrears", but she allegedly did not review any of the documents related to this proceeding nor discover WIC's purported reason for withholding rent. (Perine Aff. ¶ 18; Perine Dep. at, 29-30, 32-33).

The February 6, 1997 meeting was attended by thenHPD Commissioner Lillian Barrios-Paoli, Perine, and representatives from WIC. Barrios-Paoli allegedly orally agreed to withdraw HPD's eviction proceeding against WIC and to forgive a significant portion of the back rent owed by WIC because of the damages suffered by WIC. (Compl. ¶ 36; Lewitin Decl. ¶¶ 38-39; Perine Aff. ¶ 16, Ex. G (Meeting Attendance Sheet); Perine Dep. at 24-25, 58-60, 111). At the conclusion of this meeting, Barrios-Paoli allegedly directed Perine to memorialize the oral agreement, but Perine never did. (Compl. ¶ 36; Lewitin Decl. ¶ 39).

In July 2000, Perine asked for and received from OPM a timeline of WIC's tenancy in the Building up to 1999, which documented each of the prior non-payment/eviction lawsuits involving WIC. (Lewitin Decl. ¶ 28, Ex. 30 at D1689- 1692). [FN6] This timeline, along with WIC's illegal sublet of part of its rented space in the Old School Building and other "experiences" that Perine had with WIC during her years at OPM, caused her and other

HPD personnel to view WIC as an "incompetent" tenant, and to view with great skepticism WIC's subsequent participation in the real estate sale and development project at the center of the present case, the IRSC Project. (Perine Aff. ¶¶ 19-23; Perine Dep. at 28-29, 79-80, 141-142; Deposition of John Warren ["Warren Dep."] at 35- 38, 58-59; Deposition of Matthew Shafit ["Shafit Dep."] at 18-20).

> FN6. Thereafter, in February of 2002, First Deputy HPD Commissioner John Warren learned of WIC's 1996 tort lawsuit against the City/HPD. (Lewitin Decl. ¶ 28, Ex. 67 (Memo from EST's attorney to Warren, dated February 27, 2002, attaching status update of WIC's 1996 lawsuit against the City)).

In addition to its legal advocacy concerning its own tenancy in the Building and Old School Building, WIC submitted an affidavit in support of another of the Building's tenants opposing a City/HPD eviction action in 2002, in which WIC contended that the tenant, an individual artist, should be charged rent at the subsidized rate for the Building's "cultural tenants" rather than at the "fair market rate charged to "commercial" tenants. (Lewitin Decl. ¶ 28, Ex. 92 at D 829-830 (Affidavit of Marguerite Lewitin, filed in *City of New York v. David Slivka,* No. 16411/02 (New York City Civ.Ct.2002))). First Deputy HPD Commissioner John Warren learned of this affidavit in August 2002. (*Id.,* Ex. 92 (Memo from HPD Counsel Harold Weinberg to Warren, dated August 9, 2002, attaching copy of Lewitin Affidavit filed in *City of New York v. David Slivka* )).

C. The IRSC Project

1. *1994-1999*

***7** In May of 1994, WIC, with the assistance of Defendant New York Economic Development Corporation ("EDC") and HPD, submitted to the City Planning Commission a proposal to develop the Interart Rehearsal Studio and Cultural Center ("IRSC") on the site of the Building. [FN7] (Affidavit of Valerie Rutstein ["Rutstein Aff."] ¶ 7, Ex. B; Affidavit of Katherine Collignon [Collignon Aff."], Ex. A at D2909-2921). EDC is a not-for-profit corporation that had contracted with the City to perform economic development work. (Affidavit of Andrew M. Alper ["Alper Aff."] ¶ 5). Under the IRSC proposal, the City would transfer the Property to EDC, who would sell it to WIC for $2.00. WIC would then renovate and enlarge the Building to create a 75,000 square-foot facility housing theater, dance, art, rehearsal studios and performance spaces. These were to be leased to members of the New York City arts community. (Rutstein Aff., Ex. B; Alper Aff. ¶ 7; Lewitin Decl. ¶ 32; Collignon Aff., Ex. A at D 2914; Compl. ¶ 33).

> FN7. The proposal was submitted for approval through the Planning Commission's Uniform Land Use Review Procedure ("ULURP").

The new IRSC would eventually provide space for EST and four current visual artist Building tenants. [FN8] In the interim, they would be temporarily relocated at WIC's expense during the construction phase of the Project. Upon completion, it was contemplated that they would return to the renovated Building under comparable lease terms. (Lewitin Decl. ¶¶ 31, 57; Collignon Aff., Ex. A at D 2915, 10822-10823). In addition, WIC would be responsible for the costs of permanent relocation of the other Building tenants. (*Id.*)

FN8. The visual artist tenants were David Slivka, Studio for Visual Research, Gary DePasquale, and Dorothy Gillespie. (Collignon Aff. ¶ 7 n.2).

During the spring and summer of 1994, EST voiced its opposition to the temporary relocation details of WIC's proposal. WIC's offer to pay only $59,000.00 to cover EST's relocation costs instead of the $293,000.00 EST was seeking was of concern to the latter. (Lewitin Decl., Ex. 21 at D 2748). As a result, both New York City Community Board No. 4 and the Manhattan Borough President conditioned their approval of the Project on WIC and EST taking concrete and substantial steps to resolve their dispute. (*Id.* at D 2748 (Community Bd. No. 4 Resolution, dated June 10, 1994), and D 2751 (Manhattan Borough President Recommendation, dated June 17, 1994)).

On August 10, 1994, the City Planning Commission approved the IRSC Project, although it did not explicitly condition its approval on resolution of the WIC-EST dispute. (Lewitin Decl., Ex. 21 at D 2744). Thereafter, on September 22, 1994, the New York City Council gave its final approval to the Project and officially amended the CURA to accommodate it. (*Id.* ¶ 30; Compl. ¶ 31; Rutstein Aff. ¶ 7, Ex. B).

From 1994 until the spring of 1999, the IRSC Project stalled, largely because of WIC's inability to obtain financing. (Rutstein Aff. ¶¶ 7-8; Compl. ¶ 34). In 1997, Perine and other HPD officials expressed their negative opinions of WIC as a Building tenant to EDC Project Managers Valerie Rutstein and Carolyn Edwards. [FN9] Specifically, despite the February 6, 1997 HPD/WIC settlement, they informed Edwards and Rutstein that WIC owed HPD significant back rent and was thus not a tenant in good standing in the Building. (Deposition of Valerie Rutstein ["Rutstein Dep."] at 35-36; Lewitin Decl. ¶ 42). Nevertheless, Rutstein and Edwards helped WIC file an application with the New York City Industrial Development Agency ("IDA") for taxable bonds and other tax incentives for the IRSC Project. (Rutstein Aff. ¶ 8; Rutstein Dep. at 14- 16). In May 1997, the IDA Board of Directors adopted an inducement resolution for $12,000,000.00 in taxable industrial development bonds and other tax benefits for the Project. However, the Project was never presented for a final IDA authorization resolution because WIC was not able to produce a final underwriting commitment from an underwriting firm or other sources of funding sufficient to finance the construction and development of the Project. (Rutstein Aff. ¶ 8).

FN9. Rutstein and Edwards were assisting WIC in applying for Project financing from the New York City Industrial Development Agency ("IDA").

***8** In June of 1997 and again in September of 1998, EST contacted HPD to express its wish to purchase the Building despite the fact that the ULURP Approval specifically designated disposition of the Building to WIC. (Lewitin Decl. ¶ 51, Exs. 4 (Letter from EST to HPD, dated June 24, 1997) and 5 (Internal HPD memoranda, dated September 21, 1998).

In early 1999, WIC approached Robert Harding, then-Director of the Mayor's Office of Management and Budget ("OMB"), and EDC, seeking assistance in applying to the United States Department of Housing and Urban Development ("HUD") for a $13.5 million Section 108 loan and a $2 million Economic Development Initiative ("EDI") grant for the Project. (Rutstein Aff. ¶ 9; Rutstein Dep. at 20). EDC's Rutstein and Edwards again consulted Perine regarding WIC's performance as a Building tenant, and, in a phone call with them in the spring of 1999, Perine stated that WIC owed HPD over $60,000.00 in back rent and reiterated that WIC was not a tenant in good standing.

(Rutstein Dep. at 35; 42-43. 121; Lewitin Decl., Ex. 103 (Rutstein's Notes from phone call with Perine)). Rutstein and Edwards in turn recommended to their supervisor at EDC, Michael Carey, that EDC not support the funding applications until WIC had from HPD's point of view become a tenant in good standing. (Rutstein Dep. at 35, 44; Rutstein Aff., Ex. B at D 7356-57 (Letter from Edwards and Rutstein to Carey, dated April 8, 1999)). Carey conveyed this recommendation to Harding. (Rutstein Aff., Ex. B at D 7355).

In March and April 1999, HPD staff met with EST representatives and examined potential alternative interpretations of the ULURP language itself that would allow the Property to be disposed of to an entity other than WIC. (Lewitin Decl. ¶ 55, Exs. 9 (Memo from HPD Director of Planning Charles Marcus to Assistant HPD Commissioner Mary Bolton, dated April 22, 1999) and 11 (Letter from EST to Bolton, dated May 17, 1999)). Perine even professed her support for the EST proposal during her phone conversation with EDC's Edwards and Rutstein. and her meeting with WIC representatives in April of 1999 regarding the applications for federal financing for the IRSC. (Lewitin Decl. ¶¶ 37, 43, Ex. 103). At the meeting with WIC representatives, Perine and then-HPD commissioner Richard Roberts also informed them that WIC would have to pay HPD over $70,000.00 in alleged back rents before the City would submit the Section 108 application to HUD. (Lewitin Decl. ¶ 37).

In May 1999, HPD Commissioner Roberts met with OMB Director Harding using talking points prepared by Christopher Cirillo of HPD; Perine was copied. The talking points discussed the risk to the City's Community Development Block Grant ("CDBG") funds-- of which HPD was the largest recipient--if WIC should default on its HUD loan, [FN10] and set forth WIC's past rent payment history. (Lewitin Decl. ¶ 47, Ex. 10). Thereafter, on June 9, 1999, Harding informed WIC in writing that the City would not approve the applications for HUD financing until WIC "resolve[d]" the issue of approximately $71,000.00 in back rent that it owed to HPD. (Rutstein Aff. ¶ 12, Ex. C). On June 10, 1999, WIC President Lewitin wrote to Harding that WIC would pay HPD $70,000.00 in back rent to HPD, and EDC, on the City's behalf, submitted the EDI grant application to HUD. (Rutstein Aff. ¶ 13, Ex. D; Lewitin Decl. ¶ 39).

>       FN10. Under the EDI Grant/Section 108 loan financing structure, the City
>       would have to use its CDBG funds to satisfy the HUD loan guarantee if
>       WIC failed to make the loan payments. (Lewitin Decl., Ex. 10 at D 2501;
>       Rutstein Aff. ¶ 9 n.3).

*9 HUD approved a $2,000,000.00 EDI grant for the IRSC Project in July of 1999. (Lewitin Decl. ¶ 33; Rutstein Aff. ¶ 13, Ex. E; Compl. ¶ 41). Shortly thereafter, EDC began preparing a formal Section 108 loan application to HUD. (Rutstein Aff. ¶ 14). However, in August 1999, EST wrote to both EDC and HUD, raising several objections to the IRSC Project. EST complained that the Project had been designed without [EST's] "knowledge and consent," contrary to EDC's original requirement in 1994 that WIC reach an agreement with EST, and that WIC had in the past misrepresented that EST approved of the Project. EST also contended that WIC was not a trustworthy project manager. EST argued that the Project would threaten EST's operations both financially and artistically and that WIC's proposed temporary relocation space for it was unacceptable. EST also asked that EDC not proceed with the Project and that HUD postpone any action on WIC's loan applications until EST had reached an agreement with WIC over the temporary relocation issue. Finally, EST proposed the City now sell it a portion of the Building space (as opposed to the entire building) to be developed as a condominium which it would then finance and develop separately from WIC. (Rutstein Aff. ¶¶ 14-15, Exs. F (Internal EDC Memorandum, dated August 30, 1999, describing conflict between EST and WIC) and G (Letter from EST to HUD Secretary Andrew

Cuomo, dated August 6, 1999)).

In the fall of 1999, EST went to HPD with its condominium proposal. (Lewitin Decl., Ex. 20 at D 2846-2847 (Letter from EST to HPD Commissioner Roberts, dated October 8, 1999). HPD again reviewed the ULURP approval documents and determined that they were not an obstacle to EST's proposal. (*Id.,* Exs. 19 (Memo from HPD Assistant Commissioner Mary Bolton to HPD attorney Shafit, dated October 5, 1999), 20 at D 2844 (Memo from Bolton to Shafit, dated October 19, 1999), and 21 at D 2740 (Memo from Shafit to Bolton, dated October 28, 1999)). On December 22, 1999, EST wrote a letter to HPD, attaching a written condominium proposal it had allegedly sent to EDC. HPD forwarded that letter to EDC a week later. (Lewitin Decl. ¶ 55, Exs. 26 (EST Proposal and letter from EST to Roberts, dated December 22, 1999) and 27 (copy of letter faxed from Kimberly Hardy of HPD to EDC Attorney Robert LaPalme)).

At the same time, WIC and EDC were attempting to resolve the still on-going temporary relocation dispute between WIC and EST. In the fall of 1999, EDC convened a series of meetings, conference calls, and exchanges of proposals with WIC and EST. In December 1999, EDC put forth a proposed settlement, approved by the City OMB that included the temporary relocation of EST to the John Houseman Studio and Jose Quintero theaters and proposed terms for EST's lease upon its return to the renovated Building. (Lewitin Decl. ¶¶ 59, 66, Exs. 23 (Proposed Settlement of WIC-EST dispute, dated December 21, 1999 and faxed from Robert LaPalme to OMB and HPD) and 24 (same); Deposition of Robert LaPalme ["LaPalme Dep."] at 18-19; Compl. ¶ 46). However, EST itself never approved the proposal. (Lewitin Decl. ¶ 60; LaPalme Dep. at 19-20; Compl. ¶ 46).

*2. 2000-2001*

**\*10** In April 2000, EDC submitted the finalized Section 108 loan application to HUD, seeking $13,595,000.00 in loan guarantees for the IRSC Project. (Rutstein Aff. ¶ 20; Lewitin Decl. ¶ 33). In July 2000, EDC informed HPD that the sale of the Building would likely close within three months [FN11] and directed HPD to begin either relocation or eviction proceedings for Medicine Show and Soundscape, Inc. [FN12] (Lewitin Decl. ¶ 78, Ex. 29 (Letter from EDC to HPD, dated July 21, 2000)).

> [FN11.] HUD officially notified the City of the application's approval in September of 2000. (Rutstein Aff. ¶ 20).

> [FN12.] Medicine Show and Soundscape were commercial Building tenants who did not have a right to return to the renovated Building.

In the summer of 2000, WIC located temporary relocation space for itself and the four visual artist Building tenants by arranging to rent temporary space in the Old School Building from the Clinton Housing Development Company ("CHDC"). (Warren Aff. ¶ 17; Collignon Aff. ¶ 52 n.24, Ex. Q at D 9635-636 (Letter of Intent signed by WIC and CHDC, dated August 10, 2000)). CHDC had in turn sought and received permission for this occupancy arrangement from HPD, the Old School Building's manager. (Warren Aff. ¶ 17).

To pay for the costs of repairing the Old School Building in preparation for WIC's and the artists' relocation, City Councilperson Ronnie Eldridge committed $300,000 in discretionary City capital budget funds. (Warren Aff. ¶ 18; Collignon Aff. ¶ 10; Lewitin Decl. ¶ 77). However, New York Local Finance Law § 11.00(a)(13) required that capital funds only be used for projects with at least a five-year useful life, and the Old School Building was scheduled to be sold to CHDC [FN13] by the close of the 2003 fiscal year. (Warren Aff. ¶¶ 19-20; Collignon Aff. ¶ 11). Thus, it was determined that the $300,000

could not be used for WIC's contemplated repairs, and EDC, HPD, OMB and the City's Law Department then struggled for several months to devise a legal avenue to transfer the funds to WIC to pay for the renovations and relocation. (Warren Aff. ¶ 19; Collignon Aff. ¶ 11; Lewitin Decl. ¶ 77).

> FN13. CHDC was to renovate the Old School Building to create 53 units of residential supportive housing for homeless families under HPD's Supportive Housing Loan Program. (Warren Aff. ¶ 20; Collignon Aff. ¶ 11).

Ultimately, the funds were transferred through EDC, and on June 8, 2001, WIC and CHDC executed a lidense agreement under which WIC and the artists had the right to occupy the Old School Building until December 31, 2001, although CHDC could, in its sole discretion, extend the license for up to one year or terminate it at any time and for any reason with thirty days notice to WIC. (Collignon Aff. ¶¶ 11, 52 n.24, Ex. Q at D 9640 (License Agreement) §§ 1.1, 32; Lewitin Decl. ¶ 94; Compl. ¶ 68).

While it was WIC's responsibility under the ULURP Approval and CURA to secure temporary relocation space for EST and the four visual artist tenants and to cover the costs of permanently relocating all other Building tenants, it fell to HPD, as manager of the still-City-owned Building, to commence any necessary eviction proceedings against tenants who refused to vacate the Building voluntarily. These included EST, Medicine Show and Soundscape. (Lewitin Decl. ¶ ¶ 70-71; Perine Dep. at 116-117; Affidavit of John Warren ["Warren Aff."] ¶ 6; Warren Dep. at 86).

***11*** From July through October of 2000, [FN14] EDC, then-Deputy Mayor Harding's Office, and WIC urged HPD to send notices to vacate and notices of eligibility for relocation services [FN15] to Medicine Show and Soundscape. (Lewitin Decl. ¶ 78, Exs. 31 (Notes from July 27, 2000 meeting between Perine, Deputy Mayor Harding, Margo Lewitin and others), 37 (HPD Attorney Shafit's notes from September 2000), 41 (October 13-16, 2000 emails between LaPalme and Shafit), and 46 (Warren's handwritten notes, dated October 30, 2000)).

> FN14. Perine became HPD commissioner in July of 2000. (Warren Dep. at 34-35).

> FN15. As displaced commercial tenants in a project receiving federal funding, Medicine Show and Soundscape were each entitled to federal relocation notices and benefits under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4651. (*See* Collignon Aff. ¶ 12 n.4).

However, HPD refused to send out the eviction notices. Arguing that it would never be able to find relocation space for Medicine Show and Soundscape, HPD demanded a Memorandum of Understanding (MOU) under which EDC would hold in escrow funds sufficient to pay for HPD's relocation efforts. (Lewitin Decl. ¶ 75, Ex. 41; Collignon Aff., Ex. B (Email from HPD to EDC, dated September 10, 2001); Compl. ¶ 56). HPD held out for over a year, refusing to send out the notices without a finalized MOU and escrow in place. [FN16] (Lewitin Decl. ¶ ¶ 75-76, Ex. 41; LaPalme Dep. at 185-186).

FN16. HPD told EDC that it typically did "these MOU's with other public entities when [it] performed relocation work for their projects," and that it had "signed a number of MOU's with EDC for past projects." (Lewitin Decl., Ex. 41).

HPD insisted on the MOU and escrow despite being told by EDC in October of 2000 that OMB "would cover HPD's unreimbursed [relocation] costs directly with CDBG funds." (Lewitin Decl., ¶ 75, Ex. 41). HPD's position ultimately proved to be the correct one, as EDC acknowledged that the CDBG funds could only be used by CHDC to renovate old buildings in the CURA. (Lewitin Decl., Ex. 42 (Internal EDC emails, dated October 16, 2000)).

In November 2000, HPD informed EDC that it did not believe its role in evicting uncooperative Building tenants should extend beyond Medicine Show and Soundscape to include EST. (Lewitin Decl. ¶¶ 78-79, Ex. 106 (Emails to and from Robert LaPalme, dated November 2 and 3, 2000)). In October 2001, Perine did not evict EST still, based on her unwarranted interpretation of the ULURP. (*Id.* ¶ 79, Exs. 56-57 (Emails from Warren to Shafit, dated October 30 and 31, 2001).

Meanwhile, in October 2000, EDC officials determined that, assuming the floor plans of the Quintero were accurate, WIC's Houseman/Quintero proposal, originally made in December 1999, was a reasonable temporary relocation offer for EST. (Lewitin Decl. ¶ 67, Exs. 43 (Internal EDC email, dated October 19, 2000) and 60 (Internal EDC memorandum, dated January 4, 2002) at D 13038; Warren Dep. at 101-102; Compl. ¶ 49). Nevertheless, EST rejected it.

Besides dealing with tenant relocation and eviction issues, WIC, EDC, and the City were in the midst of negotiating the Contract of Sale for the Property in the fall of 2000. For the first six months of negotiations, WIC and EDC understood that there would be two separate closings—first a closing on the transfer of the Property, with some tenants still in the building, followed by a closing on the Project financing. (Lewitin Decl. ¶ 61; Declaration of Donald Glascoff ["Glascoff Decl."] ¶ 4; Collignon Aff. ¶ 15 n.8). However, in September 2000, HPD personnel pressed the Deputy Mayor's Office to require one closing and complete Building vacancy at the time of closing. [FN17] (Glasgoff Decl. ¶ 7). Ultimately, the Deputy Mayor's Office decided the Contract should require one closing and complete Building vacancy prior to that closing. (Shafit Dep. at 58-59). HPD, as Building manager, was the only entity with standing to evict recalcitrant tenants, and thus the only entity with effective control over the Building vacancy closing condition. (Lewitin Decl. ¶ 64; Glasgoff Decl. ¶ 7).

FN17. HPD had had a bad experience with a prior development project. The purchaser of six city-owned brownstones had been allowed to close on the purchase prior to closing on the financing, but that purchaser never secured the financing and thus never completed the planned renovations on the brownstones. (Collignon Aff. ¶ 15 n.8). On the other hand, HPD had frequently sold City-owned buildings to be renovated even when such buildings were not vacant at the time of closing. (Shafit Dep. at 60).

**\*12** The final Contract, which was executed on August 30, 2001, provided that EDC would acquire title to the property from the City and then sell it to WIC for two dollars. (Collignon Aff., Ex. G (Contract) at 2). The closing was conditioned on WIC's satisfying several substantial requirements, four of which would become increasingly problematic for WIC in the subsequent months. First, WIC had to provide, 30 days prior to closing,

signed financial commitments from outside sources for funds sufficient to pay for the purchase and rehabilitation of the Property; WIC had to close on such financing by the time the Property Sale closed. (*Id.,* Ex G §§ 4(f), 6(j)). [FN18] Second, WIC had to provide 80% completed final drawings for the Project that were acceptable to EDC, and a guaranteed maximum price ("GMP") contract [FN19] for the renovation work that demonstrated to EDC's satisfaction that the renovation could be completed within the Project Budget Amount. (*Id.* § 6(k)). [FN20] Third, WIC had to provide evidence satisfactory to the City that reasonable efforts were made to arrange for the temporary relocation of EST and the visual artist Building tenants, for paying all relocation costs, and to sign leases with these tenants for occupancy of the Building upon their return. (*Id.* § 4(h)). [FN21] Finally, WIC had to ensure that the Building was vacant by the closing date. (*Id.* § 6(o)). [FN22] If EDC "reasonably believed" WIC could not meet one or more of these conditions by the closing date, EDC had the right to terminate the Contract by giving WIC written notice. (*Id.* at 16). [FN23]

FN18. Section 4(f) of the Contract provides:

By the earlier of September 15, 2001 or 30 days prior to the date, if any, Purchaser and Seller have agreed on for the Closing, Purchaser shall (x) obain, and furnish Seller with signed copies of, financing commitments from institutions and/or governmental entities, and/or (y) demonstrate to Seller's reasonable satisfaction that equity of Purchaser is in place, which (i) is in an aggregate amount which is not less than $18,469,824 or such greater amount which it, to Seller's reasonable satisfaction, sufficient to finance the purchase of the Property and any rehabilitation of the Property required by this Contract ... and (ii) is on terms that Seller reasonably determines will permit such rehabilitation to be completed

Section 6(j) of the Contract provides that, as a "Condition for Closing,"

Purchaser shall have closed on the financing and/or funded equity of Purchaser required by section 4(f) of this Contract. At the Closing, Purchaser must provide Seller with an affidavit signed by an officer of the Purchaser that the above commitments are still in effect and the above equity is still in place. Failure to do so shall be a default by the Purchaser.

FN19. Under a "guaranteed maximum price construction" contract, the

final cost of a project cannot under any circumstances exceed the maximum price quoted in the bid offered by the contractor and accepted by the customer.

FN20. Section 6(k) of the Contract provides that, as a "Condition for Closing,"

Purchaser shall have provided Seller with (i) 80% completed final design and construction drawings for the Project, which have been reviewed and approved by the Seller and (ii) a guaranteed maximum price contract ("GMP") for the Project, which shall be obtained based on the Purchaser's receipt of bids from a least three general contractors or construction managers, with terms and conditions satisfactory to the Sller in its sole discretion, which provides a guaranty, from a general contractor or construction manager acceptable to the Seller, that the Project shall be completed.

FN21. Section 4(h) of the Contract provides:

By the earlier of September 30, 2001 or 15 days prior to the date, if any, Purchaser and Seller have agreed on for the Closing, Purchaser shall furnish Seller evidence, in a form satisfactory to Seller in its sole discretion, that it has made good faith reasonable efforts to enter into binding agreements to (x) lease to [EST and the four visual artist

tenants] (the "Existing Tenants") their current premises within the Building (which leases will be effective after the renovation of the building upon the issuance of temporary certificates of occupancy for the Building), it being understood that the leases will include below market rents and other terms satisfactory to the Seller in its sole discretion, and (y) relocate, at Purchaser's expense, each Existing Tenant to temporary premises in Manhattan (below 110th Street), comparable to such Existing Tenant's current premises within the Building, for use during the renovation of such Tenant's Building premises ...

FN22. Section 6(o) of the Contract provides that, as a "Condition for Closing,"

The Seller shall have determined, in its sole discretion, that the Building is vacant and that there are no persons with claims or interests as holdover tenants or other asserted occupancy rights, other than Existing Tenants which have been relocated to other premises ...

FN23. Other conditions WIC had to satisfy included: (1) submission of a Property development plan approved by HPD, (2) securing an authorizing

resolution from the IDA that approved a real estate tax exemption for the Property, and (3) paying all rent "due and owing" to the City under its

lease for its space in the Building. (Collignon Aff., Ex. G §§ 6(g), (h) and (i)).

The Contract set a closing date of October 15, 2001 (Collignon Aff., Ex. G § 5(a)), but the parties agreed to extend it to December 15, 2001. [FN24] (Lewitin Decl. ¶ 96; Collignon Aff. ¶ 16 n.9; Compl. ¶ 75). On October 18, 2001, EDC informed WIC by letter that WIC had not satisfied three of the pre-closing conditions enumerated in the Contract: (1) closing on the required financing and/or funded equity, (2) provision of the 80% final design drawings and GMP, and (3) Building confirmed vacant. (Lewitin Decl. ¶ 97, Ex. 54; Compl. ¶ 76).

FN24. Following the first extension of the closing date to December 15, 2001, EDC and WIC agreed to three more extensions through April 13, 2002. (Lewitin Decl. ¶ 96; Collignon Aff. ¶ 16 n.9)

In November 2001, after EDC and HPD had executed their relocation MOU, HPD finally served 30-day notices of month-to-month tenancy termination and notices of eligibility for relocation services on Medicine Show and Soundscape, and a 90-day notice to vacate on EST. (Warren Aff. ¶ 12; Collignon Aff. ¶ 19, Ex. I). But, during this same month, CHDC served an eviction notice on WIC and the visual artists that WIC had relocated to the Old School Building because the Old School Building had to be vacated so that CHDC's project could commence during the fiscal year ending June 30, 2003. (Warren Aff. ¶ 20; Lewitin Decl. ¶ ¶ 109, 111; Compl. ¶ 83).

In early December 2001, HPD, at the behest of Perine, issued a request for proposals (RFP) for a separate $170 million development of another CURA property to include a rent-free theatre space for EST and theatre space for INTAR, another theatre company which had been working out of a building adjacent to the Property. (Lewitin Decl. ¶ 83; Perine Dep. at 63; Warren Aff ¶ 16). However, despite suggestions from both the Deputy Mayor's office and EDC to do so, HPD did not condition EST's space in the new development on its willingness to relocate from the Building during the construction phase of the IRSC project. (Lewitin Decl. ¶ 87, Exs. 58 (Barbara Flynn Memorandum to File, dated December 3, 2001), 66 (Memo from EDC to Deputy Mayor's Office, dated February 21, 2002)).

3. *2002-2003*

*13* Mayor Michael Bloomberg's administration took office in January 2002. That same month, HPD commenced eviction proceedings against Medicine Show and Soundscape. (Collignon Aff. ¶ 39 n.22). However, a month later, it promptly adjourned the proceedings because, in its view, the IRSC project did not appear to be moving forward. (*Id.;* Lewitin Decl. ¶ 103, Ex. 65 (email from Warren to HPD staff, dated February 15, 2002)). During this same period, HPD staff were in contact with new Deputy Mayor Daniel Doctoroff and his staff about the IRSC Project. In mid-February 2002, Veronica Geist, WIC's Director of Special Projects, allegedly received a phone call from EDC Project Manager Katherine Collignon, who told Geist that HPD staff had been "aggressively speaking" to [Doctoroff] and his staff against the Project," and denigrating the project to such an extent that Collignon thought Doctoroff would be convinced to kill the Project if someone did not intervene to counter HPD's denigration. (Affidavit of Veronica Geist ["Geist Aff."] ¶ 5; Compl. ¶ 81). Perine herself met regularly with

Doctoroff for the first nine months of 2002 to discuss HPD-related business including the IRSC Project. She expressed "strong feelings" about WIC's involvement in the Project to the Deputy Mayor at some point in late February or early March 2002. (Lewitin Decl. ¶ 102, Ex. 70 (March 4, 2002 email from Doctoroff to Laurel Batchford and Roy Bahat); Doctoroff Dep. at 27).

EDC was also having its own serious doubts in early 2002 about whether WIC had secured sufficient funding to complete the construction phase of the IRSC Project. (Collignon Aff. ¶ 23, Ex. M (Letter from EDC to WIC, dated February 11, 2002)). Nevertheless, in March of 2002, after performing due diligence on WIC's project financing and concluding it was sound, EDC advised Doctoroff's staff that there was no viable alternative to proceeding with the project. (Lewitin Decl., Exs. 71-72 (Deputy Mayor's Office Internal Memoranda, dated March 13 and March 22, 2002)). The Deputy Mayor in turn decided to continue moving forward with the Project and directed HPD to proceed with its eviction efforts. (*Id.* ¶ 107, Ex. 73 (Email from Doctoroff to Laurel Blatchford and Roy Bahat, dated March 23, 2002); Doctoroff Aff. ¶ 9).

After serving a 30-day notice to vacate on EST on March 27, 2002 (Collignon Aff., Ex. J; Warren Aff. ¶ 12), HPD did not commence eviction proceedings against EST once the 30-day period in which to vacate expired at the end of April 2002, nor did HPD restart eviction proceedings against Medicine Show and Soundscape for several more months. (Collignon Aff. ¶ 39 n.22, Ex. Z at D131 (Letter from EDC to Medicine Show, dated July 16, 2002,) and D1315 (Letter from EDC to Soundscape, dated July 16, 2002), Ex. AA (Letter from Collignon to EST, dated July 11, 2002); Lewitin Decl. ¶ 114, Ex. 83 (Email from HPD attorney Harold Weinberg to Warren, dated June 5, 2002); 86 (Email from WIC attorney Glascoff to EDC attorney LaPalme, dated July 9, 2002)).

*\*14* Meanwhile, in April 2002, CHDC commenced eviction proceedings against WIC and the visual artists to remove them from their temporary spaces in the Old School Building. (Warren Aff. ¶ 20; Lewitin Decl. ¶¶ 109, 111; Compl. ¶ 83); *see also Clinton Housing Development, Net Lessees for NYC v. Women's Interart Center, Inc.,* No. 66084/02 (N.Y. City Civ.Ct.2002).

EST also continued to object vehemently to the IRSC Project in the first half of 2002, contacting HPD Deputy Commissioner John Warren frequently to voice its opposition and to request an audience with EDC and the Deputy Mayor. (Warren Dep. at 71-72; Lewitin Decl. ¶ 81, Exs. 64 (Memo from EST attorney to Warren, dated February 5, 2002), 117 (Memo from EST to Warren, dated April 24, 2002)). Warren in turn conveyed EST's concerns to, and set up a meeting for EST with, EDC and the Deputy's Mayor's Office in May 2002. (Lewitin Decl. ¶¶ 80, 82, Ex. 80; Warren Aff. ¶ 15; Warren Dep. at 267).

On April 9, 2002, WIC for the first time submitted to EDC copies of two bids on the Project renovation work that it had originally received in November 2001 and a summary analysis of the bids. (Collignon Aff. ¶ 25, Ex. N (copies of bids and summary analysis); Compl. ¶ 86). Both bids were for approximately $17.5 million, which exceeded the Project's base building construction budget by 30%. This caused "major concerns" [FN25] among EDC staff about the "[P]roject's viability" again. On April 18, 2002, their concerns were communicated to the Deputy Mayor's Office and to WIC. (Collignon Aff. ¶¶ 25-28, Exs. O at D7839 (Internal EDC Memo, dated April 11, 2002) and P (Memorandum from EDC to Deputy Mayor's Office staff, dated April 18, 2002)). EDC also scheduled a meeting with WIC and the Deputy Mayor's Office for April 25, 2002 to discuss these construction cost issues and to determine whether WIC could show that the Project could be completed with the available funding. (*Id.* ¶ 27).

FN25. Meanwhile, on April 12, 2002, WIC and EDC executed an

additional 30-day extension of the closing date, to May 12, 2002. (Collignon Aff. ¶ 31 n.15).

At the April 25, 2002 meeting, WIC agreed to provide to EDC by May 28, 2002 documentation showing that the two $17.5 million construction plans it had submitted on April 9, 2002 could in fact be completed within the Project's budget. WIC was given the option of making this showing in one of two ways. First, it could document how the costs of the bids could be lowered by $5.7 million by making value engineering adjustments to various cost items in each bid. In the alternative, WIC could use value engineering adjustments to lower costs by $4.8 million and also provide written commitments for an additional $1 million in New York State Energy Research and Development Authority (N.Y.SERDA) "Smart Loans" that WIC claimed were available to it. Moreover, under either option, WIC's showing also had to account for an industry-standard 10% contingency to cover hard costs in the Project budget. (Collignon Aff. ¶ 34, Ex. S (Letter from Collignon to Lewitin, dated April 30, 2002, confirming the agreement made at the April 25th meeting)). EDC also agreed to extend the closing date yet again to June 7, 2002. (*Id.* ¶ 34 n.18).

*15 On May 28, 2002, WIC provided documentation designed to satisfy the second option, but it did not include a lender commitment letter for the additional NYSERDA financing [FN26] or account for the 10% hard-cost contingency. (Collignon Aff. ¶¶ 35-36, 38, Exs. U (WIC's submissions) and W (Memo from EDC to Doctoroff, dated June 7, 2002); Lewitin Decl. ¶ 116, Ex. 85 (Notes from EDC's June 7, 2002 meeting with WIC)). Nevertheless, EDC extended the closing date to July 31, 2002. (Lewitin Decl., Ex. 85; Collignon Aff. ¶ 39 n.21).

> FN26. However, WIC did submit a letter from NYSERDA stating that it was eligible for the Smart Loans, and a letter from Community Capital Bank (CCB) stating that CCB would consider WIC's Smart Loan applications. (Collignon Aff., Ex. U at D 12119-12120).

WIC's May 28, 2002 submissions also included Project revenue projections that were 9% higher than any of WIC's previous projections. (Collignon Aff. ¶ 37, Ex. W). These new projections, along with the lack of written commitments for the $1 million in NYSERDA financing and the increase in the Project's debt servicing this additional financing would create, raised doubts for EDC about the financial feasibility of the Project. (*Id.* ¶¶ 37-38, Ex. W). Consequently, in June 2002, with the concurrence of the Deputy Mayor's Office, EDC commissioned an independent consultant, AMS Planning & Research Corp. ("AMS"). AMS was to analyze the soundness of WIC's Project revenue projections to confirm that the projected debt service coverage ratio (DSCR) for the Project was at least 1.2 (i.e., that projected Project cash flows would equal at least 120% of the projected debt service for the Project). [FN27] (Collignon Aff. ¶¶ 39, 41; Lewitin Decl. ¶ 117; Compl. ¶ 87).

> FN27. EDC commissioned this analysis even though a similar independent consultant's analysis in 2000 had concluded the Project's DSCR was 1.25, a figure confirmed by that consultant's updated evaluation in 2001. (Lewitin Decl. ¶ 118; Compl. ¶ 88).

AMS' August 2002 final report concluded that "[d]emand remains high" for Manhattan rehearsal spaces which met current market standards for amenities and services, that the proposed IRSC spaces "seem[ed] to meet current standards and should be in demand," and that "there is interest among both Off-Broadway and Broadway

producers to program additional 499-seat theaters in Manhattan" like the one to be included in the IRSC. [FN28] (Collignon Aff., Ex. BB (AMS Report) at 23).

> FN28. In addition, AMS noted that "while the forecast developed by WIC is highly sensitive to utilization and projects revenues at the high end of the scale, there does seem to be precedent for the proposed commercial rates" at which WIC intended to rent the IRSC studio and theater
>
> space, and, "[g]iven the projected reserve fund, the model [would be] able to absorb some level of adjustment in operating costs and revenues." (Collignon Aff., Ex. BB).

Nevertheless, the Deputy Mayor's Office and EDC remained convinced throughout July and August 2002 that the IRSC Project was not financially viable. On July 24, 2002, after receiving a draft of the AMS report, Roy Bahat of the Deputy Mayor's Office wrote an Email to Katherine Collignon of EDC characterizing the report as being "too generous to WIC" and arguing that AMS' "worst case scenario" in terms of revenues and operating costs should actually be the "base case" for the Project. (Lewitin Decl., Ex. 87). On July 30, 2002, when Perine met with EDC staff members, "all agreed [the IRSC Project] was not feasible," and Perine hinted that she wanted to stop the Building tenant eviction efforts. (Lewitin Decl., Exs. 88-89 (Emails between EDC and Deputy Mayor's Office staff, dated July 31 and August 2, 2002)). However, the Deputy Mayor's Office, upon hearing of Perine's feelings, emphasized that the eviction proceedings had to continue. (*Id.,* Ex. 89).

*16* Thereafter, in early August 2002, the Deputy Mayor's Office, convinced that AMS' assumptions were too generous, performed its own DSCR calculations and determined that the DSCR for the Project would only be 1.02-1.05, which was too low a number to support the Project moving forward. (Doctoroff Aff. ¶ 16; Lewitin Decl., Ex. 91 (Internal City Department of Cultural Affairs Email, dated August 9, 2002)). On August 12, 2002, citing the three "key factors" that WIC had to satisfy prior the Project closingfinancial feasibility, a satisfactory tenant relocation plan, and the establishment of final construction costsValerie Rutstein wrote that "[i]n the life of this project, every time any one of the above three factors is settled, the other one or two become undone, leading to cyclical delays." (Collignon Aff., Ex DD (Internal EDC memorandum)).

On August 16, 2002, several EDC and City officials [FN29] met to discuss the future of the IRSC Project. (Collignon Aff. ¶ 49). The possibility of terminating the Project was among the topics discussed. (Warren Aff. ¶ 21; Warren Dep. at 75-79). Thereafter, on August 23rd, EDC Project Manager Collignon sent a letter to WIC President Lewitin in which EDC offered to extend the closing date to October 31, 2002 but required that WIC submit to EDC by that date documentation of its satisfying the three pre-closing Contract conditions already discussed. (Lewitin Decl. ¶ 123, Ex. 112 (Collignon letter to Lewitin, dated August 23, 2002); Collignon Aff. ¶¶ 49-50, Ex EE; Compl. ¶ 92). Collignon's letter emphasized that WIC's failure to meet its obligations under the Contract by October 31, 2002 would result in termination of the Contract. (Lewitin Decl., Ex. 112; Collignon Aff., Ex. EE).

> FN29. Attending the meeting were Doctoroff, members of his staff, Kate Levin and Kathy Hughes of the City Department of Cultural Affairs, Susan Shapiro of the Corporation Counsel's Office, various EDC staff members, and Deputy HPD Commissioner Warren. (Collignon Aff. ¶ 49).

In response, WIC complained that by requiring this documentation, EDC was actually modifying the terms of the Contract and the parties' understanding of what conditions WIC still had to satisfy before closing. (Collignon Aff., Ex. FF (Letter from Lewitin to Collignon, dated September 5, 2002, and Letter from WIC Attorney Glascoff to EDC Attorney LaPalme, dated August 29, 2002)). WIC also argued that it could not secure loan commitment letters until a firm closing date was set, and that WIC had in fact satisfied its relocation obligations with respect to EST and visual artist tenants . [FN30] (*Id.,* Ex. FF (Lewitin Letter) at 3).

> FN30. WIC also complained that the City has "continually refused, for no valid reason," to close on the sale of the Property until all tenants have been relocated, and that the City itself "has prevented [WIC] from meeting the vacancy requirement under the [C]ontract of [S]ale" by refusing to relocate Soundscape and Medicine Show and begin eviction proceedings against EST. (Collignon Aff., Ex. FF (LaPalme letter) at 2).

EDC in turn replied that it was simply "requesting that WIC satisfy the terms and conditions of the original Contract" and repeated its demands that WIC still had to find comparable relocation space for EST and the visual artists who were currently residing in the Old School Building. [FN31] (Collignon Aff., Ex. GG (Letter from LaPalme to Glascoff, dated September 11, 2002). Ultimately, WIC executed a letter agreement with EDC that extended the closing date to October 31, 2002, acknowledged that WIC still had to meet the loan financing, GMP contract, and tenant relocation conditions for closing by that date, and acknowledged that EDC could terminate the Contract if it reasonably believed WIC would not be able to satisfy one or more of these conditions by that date. (Collignon Aff. Ex. GG (Letter Agreement between EDC and WIC, dated August 24, 2002 and fully executed on September 11, 2002)).

> FN31. Because CHDC had terminated its license agreement with WIC and commenced eviction proceedings against WIC and the visual artist tenants, their removal from the Old School Building was imminent and thus new relocation space had to be found for them.

*\*17* Meanwhile, on September 9, 2002, EST commenced a federal lawsuit in this District against WIC, the City, HPD, EDC, HUD, and others, challenging the IRSC Project and seeking to stay HPD's eviction proceedings against it. [FN32] (Collignon Aff. ¶ 53; Warren Aff. ¶ 12; Compl. ¶ 93); *see also* Complaint filed in *EST, et al. v. WIC, et al.,* 02 Civ. 7159(NRB) (S.D.N.Y.2002). While Judge Buchwald declined to issue a stay, she urged the City and HPD not to commence eviction proceedings against EST, and the City and HPD agreed. (Collignon Aff. ¶ 54). Judge Buchwald also suggested, and EST, WIC, EDC and HPD agreed, to submit the issue of the reasonableness of WIC's temporary relocation offer to EST to binding arbitration before her. (*Id.* ¶ 55).

> FN32. It does not appear from the record, however, that HPD ever actually commenced eviction proceedings against EST. (*See* Lewitin Decl., Ex. 86 (email from WIC to EDC, dated July 9, 2002, stating that WIC attorneys could not locate a court index number for HPD's eviction proceeding against EST)).

Over the next two months, EST, WIC, and EDC engaged in extensive negotiations over proposed temporary relocation space for EST. Because the Jose Quintero Theater was not available for the 2002-03 and 2003-04 seasons, WIC replaced the Quintero with an offer of the Mint Theatre for five weeks in the 2002-03 season and for 20 weeks in the 2003-04 season. (Collignon Aff. ¶¶ 60-61, Ex. LL (Letter from EST's Attorney to EDC Senior Counsel, dated October 25, 2002), NN (Letter from WIC Attorneys to City Attorneys, dated October 31, 2002)). This offer was rejected by EST. (Collignon Aff. ¶ 62, Ex. PP. (Letter from EST to City and EDC, dated November 4, 2002)). Meanwhile, on October 29, 2002, staff from EDC, the Deputy Mayor's Office, and the Department of Cultural Affairs, and HPD's Warren [FN33] met to develop "talking points" and a Project time line for use in responding to press inquiries, possible litigation, or other fallout from a potential termination decision. (Lewitin Decl. ¶ 130, Exs. 113 (Agenda from Meeting to Develop Talking Points) and 114 (Draft 10.0 of Talking Points); Collignon Aff. ¶¶ 103- 104).

> FN33. At some point in the fall of 2002, health concerns caused Perine to scale back her involvement in the IRSC Project and to cease her regular meetings with the Deputy Mayor. (Perine Aff. ¶ 30; Doctoroff Dep. at 27).

On October 31, 2002, WIC submitted three letters, two to EDC and one to the City Corporation Council's Office, attaching documentation that WIC claimed should "complete the package of information" EDC had requested in its August 23rd letter. (Collignon Aff., Exs. NN (Letter from Glascoff to Shapiro, dated October 31, 2002) and WW (Letters from Lewitin and John Robbins to Collignon, dated October 31, 2002); Lewitin Decl. ¶ 125). The attached documentation included an executed construction management agreement between WIC and Lehr Construction Company that included GMP terms, WIC's proposal of relocation space in the Houseman and Mint Theatres for EST, draft leases for the tenants returning to the Building after renovation, an updated Project Budget, HUD commitment letters for the Section 108 and EDI grant funding, and commitment letters from several other funding sources. (Collignon Aff., Exs. NN and WW). However, WIC failed to provide commitment letters for the NYSERDA Smart Loans and a $200,000 grant from the Empire State Development Corporation (ESDC) that WIC listed as funding sources in one of its October 31, 2002 letters. Further, with respect to tenant relocation, WIC simply reiterated it had already met its relocation obligations with respect to the visual artists by moving them to the Old School Building and declared that documents in its April 17, 2002 submissions sufficiently detailed its relocation budget and funding to pay for relocation costs. (*Id.,* Ex. WW).

***18*** After receiving WIC's submissions, EDC promptly wrote to WIC President Lewitin on November 4, 2002, extending the closing date to November 15, 2002, and asking her either to confirm that WIC's submissions constituted the entirety of its efforts to satisfy its obligations under the Contract or to provide additional documentation by November 15, 2002. (Collignon Aff., Ex. XX (Letter from EDC to Lewitin, dated November 4, 2002)). On November 7, 2002, Lewitin wrote back, confirming that WIC had submitted all of its documentation. (*Id.,* Ex. XX (Letter from Glascoff to EDC, dated November 7, 2002)). Thereafter, on November 8, 2002, after conducting a preliminary review of WIC's submissions, EDC again wrote to Lewitin, this time with a list of questions and concerns raised by the submissions. [FN34] (*Id.,* Ex. YY (Letter from Collignon to Lewitin, dated November 8, 2002)).

FN34. These questions and concerns included: (1) whether and where the GMP contract accounted for costs associated with performance bonds the construction manager was required to carry, (2) what were the specific costs of the builder's risk insurance for which WIC was responsible under the construction management agreement, (3) the lack of commitment letters for the NYSERDA loans and the ESDC grant, (4) lack of documentation of comparable relocation space for the visual artists previously relocated to the Old School Building, (5) whether the Project Budget includes funding for relocation costs, and (6) the lack of a relocation budget for moving EST and the visual artist tenants to proposed relocation spaces. (Collignon Aff., Ex. YY).

With respect to the loan commitments, Lewitin responded on November 14, 2002, that the ESDC grant was to go before the ESDC board for final approval on December 19, 2002, and that the NYSERDA loans were approved on November 6, 2002, but with a contingency. [FN35] (Collignon Aff., Ex. ZZ (Lewitin Letter to EDC, dated November 14, 2002) at 2). However, Lewitin provided no further documentation of commitments for any of this funding, stating simply that "the loan funds will be available at closing." (*Id.*). Similarly, Lewitin provided several suggestions of possible relocation alternatives for the visual artist tenants without documentation demonstrating that these spaces were in fact available. (*Id.* at 2-3). As for the relocation cost and funding issues, Lewitin again only referred to WIC's April 17, 2002 submissions and did not submit a detailed relocation budget. (*Id.* at 4). [FN36]

FN35. Approval of the NYSERDA loans was contingent on receiving commitment fees of $5000.00 per loan and additional financial information from the Nederlander Organization, to whom WIC had agreed to rent the 499- seat theatre in the renovated Building. (Collignon Aff., Ex. ZZ).

FN36. Also on November 14, 2002, WIC's IRSC Project Manager John Robbins stated that the builder's risk insurance was not a requirement of the IRSC Project and that the performance bonds similarly were neither required, cost-effective, nor warranted. (*Id.,* Ex. AAA (Letter from

Robbins to Collignon, dated November 14, 2002)).

On that same day, EDC wrote to WIC and EST, announcing that it had evaluated WIC's modified relocation proposal for EST and determined that WIC's offer was unreasonable and EST's refusal of such offer was reasonable. (Collignon Aff. ¶ 66, Ex. SS). WIC then requested the opportunity to propose alternative relocation space for EST but never made any specific proposals. (*Id.* ¶ 92, Ex. BBB (Internal EDC Memorandum, dated December 10, 2002) at D7935). [FN37]

FN37. In the end, EST neither accepted a temporary relocation offer nor was removed from the Building prior to the termination of Contract, and within a week of the official termination, EST withdrew its motion for interim injunctive relief, after which Judge Buchwald discontinued the

action without prejudice to restoration within 60 days. (Collignon Aff. ¶ 70 n.28, Ex. VV (Order of Judge Buchwald, dated December 17, 2002)). It is also unclear from the record whether Medicine Show and Soundscape ever relocated or were removed from the Building.

On December 10, 2002, after consultation with Deputy Mayor Doctoroff's Office, EDC personnel Collignon and Susan Goldfinger sent an internal memorandum to then-EDC Executive Vice President Robert Balder recommending that EDC terminate the Contract. (Collignon Aff. ¶ 83, Ex. BBB). Collignon and Goldfinger stated that WIC's GMP contract with Lehr Construction, while sufficient, would expire if the Property sale did not closed by December 31, 2002 and did not provide for performance bonds or builder's risk insurance. (Collignon Aff., Ex. BBB at D 7934-35). They also stated that WIC had not obtained commitment letters for the $200,000.00 ESDC grant or the two $500,000.00 NYSERDA loans. (*Id.* at D 7935). Finally, they stated that tenant relocation issues remained unresolved since the Old School Building and the Houseman and Mint Theatres no longer provided sufficient relocation alternatives for the visual artist tenants and EST, and WIC had failed to provide specifications, availability or rental price information for other possible relocation spaces. (*Id.*).

**\*19** Balder adopted his staff's recommendation and, on December 10, 2002, sent a letter to WIC terminating the contract. In the letter Balder explained that, after reviewing WIC's submissions of October 31 and November 14, 2002, it had "determined that WIC has not satisfied its obligations under the Contract" and that "the Conditions for Closing as set forth in Section 6 of the Contract cannot be fulfilled." (Lewitin Decl., Ex. 99 (EDC termination letter) at 1). Specifically, Balder noted that "WIC had failed to demonstrate that as of November 15, 2002, it had sufficient financing commitments to finance the purchase of the Property and the rehabilitation of the Property" as required by sections 6(j) and 4(f) of the Contract. (*Id.*). He also noted that WIC had not "demonstrated that it made a reasonable effort to relocate certain tenants to comparable premises, as required under Contract Sections 6(o) and 4(b) "because it had not "identified satisfactory relocation space" for the visual artist Building tenants who were being forced out of their temporary space in the Old School Building. (*Id.* at 2). Finally, Balder noted that because WIC had still not specifically identified temporary relocation space that would be acceptable to EST, "EDC believes that the Condition to Closing specified in Contract Section 6(o), requiring that the Property be vacant at closing, will not be fulfilled." (*Id.*). [FN38]

> FN38. EDC's termination decision was in turn supported by the Deputy Mayor's Office, HPD staff, including Perine, and the City Department of Cultural Affairs. (Doctoroff Dep. at 57-58).

After termination, WIC made numerous efforts over the next several months to convince EDC and the City to reconsider their decision. On December 12 2002, WIC's Lewitin sent a letter to EDC's Alper, attaching a "revised" IRSC Project budget which purported to devote more Project money to the tenant relocation requirements. (Collignon Aff. ¶ 106, Ex. EEE). The following day, Lewitin sent Alper a second letter, attaching a letter from Fred Papert of the 42nd Street Development Corporation which indicated in very general terms its willingness to rent temporary office and theatre space in Theatre Row to EST during the IRSC Project's construction phase. (*Id.* ¶ 106, Ex. FFF). Thereafter, on December 19, 2002, Lewitin sent a letter to Deputy Mayor Doctoroff stating that WIC had "completed negotiations" for "not less than $720,000.00" in "additional equity for the [P]roject" to be provided by the National

Development Council Corporate Equity Fund (NDC-CEF), and attaching a tentative commitment letter from NDC-CEF. [FN39] (*Id.* ¶ 106, Ex. GGG; Lewitin Decl. ¶ 140).

> FN39. NDC-CEF promised to "invest an amount equal to $0.85 for every dollar of rehabilitation tax credits" for which the Project was deemed eligible-an amount WIC estimated to be over $8,000,000.00-but refused to "state a specific dollar amount" for such investment. (Collignon Aff. ¶ 106, Ex. GGG; Lewitin Decl. ¶ 140).

In response, Doctoroff and his staff met with WIC representatives, including board members Ronnie Eldridge and Thomas Russo and attorney Donald Glascoff, at City Hall on December 16, 2002. The WIC representatives questioned Doctoroff about the City/EDC's decision to terminate the IRSC Project. (Collignon Aff. ¶ 107, Ex. HHH (Letter from Doctoroff to Eldridge and Russo, dated December 20, 2002)). On December 20, 2002, Doctoroff wrote to Eldridge and Russo, reiterating that the City and EDC lacked confidence in the financing components of the IRSC Project, given WIC's failure to provide firm commitment letters for all project financing by the November 15, 2002 deadline and WIC's concession at the December 16th meeting that it still lacked commitments for two outstanding loans. (Collignon Aff. ¶ 107, Ex. HHH). Doctoroff also stated that "financing issues [were] but a part of a larger, more complex decision process that led to termination of the project," and that another "crucial factor in the termination decision" was WIC's failure to identify alternative relocation space for the six visual artist Building tenants that would be available throughout the IRSC Project's construction phase. (*Id.*). Further, Doctoroff noted that WIC's relocation proposal for EST at the Houseman theatre was inadequate and that WIC's assurances it could secure supplemental office and theatre space for EST at Theatre Row were unconvincing since WIC's December 13, 2002 letter "ma[d]e it clear that WIC still has not negotiated rental terms" for the additional space, nor "presented it to EST for its approval." (*Id.*). Finally, Doctoroff stated that he "d[id] not expect [his] staff or EDC to review additional documents in connection with this project." (*Id.* ¶ 108, Ex. HHH).

*\*20* Nevertheless, WIC continued its efforts to resuscitate the IRSC Project into mid-May of 2003. On May 14, 2003, WIC attorney Glascoff wrote a letter to Mayor Bloomberg, Doctoroff, and Alper stating that the IRSC Project was eligible to receive over $10,500,000.00 in additional equity through National Development Council's New Markets Tax Credit (NMTC) and Historical/Rehabilitation Tax Credit (RTC) programs and proposing that WIC pay the City $2,000,000.00 from the tax credit proceeds to purchase the IRSC site. (Collignon Aff. ¶ 109, Ex. JJJ). On May 23, 2003, Alper wrote back, noting that Glascoff's letter did not "address any terms, structure, or security for the proposed new funds, including the continued availability of the [Rehabilitation Tax Credit] program," which Alper believed was to be phased out in 2003. (Collignon Aff. ¶ 110, Ex. KKK). In addition, Alper reiterated that the Contract termination decision "was not based solely upon WIC's shortfall in funding commitments," but that "an equally significant factor" was "WIC's failure to resolve the relocation issues for the tenants of [the Building], which [in EDC and the City's view], remain[ed] unchanged." (*Id.*). On June 3, 2003, Glascoff wrote another letter to Alper, attaching a commitment letter, dated May 30, 2003, from NDC in which NDC promised that WIC would receive an equity investment for the IRSC Project through the NMTC program in an amount estimated to be over $8.2 million. (Collignon Aff. ¶ 111, Ex. LLL). Glascoff also stated that WIC had "located a private sector relocation site for the [Building artist tenants] as well as space appropriate for EST" for which WIC was prepared to sign a two-year lease "as soon as the City honors its obligations under the Contract of Sale." (*Id.,* Ex. LLL). On June 16th, WIC served Defendants with the present lawsuit. (*Id.* ¶ 112).

III. DISCUSSION

A. 12(b)(1) Dismissal

1. *Legal Standard*

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). In the present case, WIC contends that this Court has federal question subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and 1367(a) based on the two § 1983 claims. (Compl.¶ 8). For a district court to have federal question jurisdiction over a civil action, that action must include one or more federal statutory or constitutional claims that are substantial. *See Hagans v. Levine,* 415 U.S. 528, 536-37, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) (listing cases). The substantiality inquiry is, however, separate and distinct from the question of whether the plaintiff can state a claim for which relief may be granted. *See Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed.2d 939 (1946) (Emphasizing that jurisdiction "is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."); *Carlson v. Principal Financial Group,* 320 F.3d 301, 306 (2d Cir.2003) ("[T]he question of whether a federal statute supplies a basis for subject matter jurisdiction is separate from, and should be answered prior to, the question of whether the plaintiff can state a claim for relief under that statute.").

*\*21* Instead, "where the complaint ... is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court ... must entertain the suit" unless the alleged federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or "is wholly insubstantial and frivolous." *Bell,* 327 U.S. at 682-83; *Goldman v. Gallant Securites, Inc.,* 878 F.2d 71, 73 (2d Cir.1989) (per curiam) (citing *Bell* ). A federal claim is only insubstantial if it is "obviously without merit" or "essentially fictitious," or because its "unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." *Hagans,* 415 U.S. at 537 (citations and internal quotations omitted). Moreover, just because a plaintiff "also seeks relief for alleged violations of state law does not make his federal claims immaterial or insubstantial." *Goldman,* 878 F.2d at 73. Finally, while a district court considering a motion to dismiss under Rule 12(b)(1) generally "may refer to evidence outside the pleadings." *Makarova,* 210 F.3d at 113, a court making the substantiality determination should examine only "the complaint on its face, without resort to extraneous matter." *Giulini v. Blessing,* 654 F.2d 189, 192 (2d Cir.1981) (citations omitted); *see also Hagans,* 415 U.S. at 539-541 (refusing to find Equal Protection claim insubstantial for jurisdictional purposes where it was not "immediately obvious *from the face of the complaint*" that contested governmental policy had a rational basis) (*emphasis added* ).

2. *First Amendment Retaliation Claim*

Defendants do not dispute that WIC's first cause of action is drawn to seek recovery under 42 U.S.C. § 1983 and the First Amendment. Indeed, the Complaint alleges that Defendants "acted under color of state law" to "unlawfully retaliate[ ] against [WIC] for its lawful exercise of its rights to free speech and petition" as guaranteed under the First Amendment. (Compl.¶¶ 111-116). Instead, Defendants appear to argue that WIC's First Amendment retaliation claim is insubstantial because WIC lacks standing to bring such a claim and nevertheless cannot satisfy any of the elements of a viable retaliation claim. (Defendants' Memorandum of Law in Support of Motion to Dismiss Complaint ["Def. Mem."] at 8-9).

"The First Amendment's guarantee of freedom of speech protects government employees from termination *because* of their speech on matters of public concern." *Board of County Commissioners v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (citations omitted). At the same time, the right to petition government "for redress of grievances ... is among the most precious of the liberties safeguarded by the Bill of Rights ... intimately connected both in origin and in purpose, with the other First Amendment rights of free speech and free press," *United Mine*

*Workers of America, Dist. 12 v. Illinois State Bar Assoc'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967), and this "right of petition applies with equal force to a person's right to seek redress from all branches of government." *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988) (citations omitted). Moreover, the First Amendment rights of free speech and petition extend beyond individuals to corporate entities. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (recognizing First Amendment right of group of highway trucking companies to petition state and federal agencies and courts); *Austin v. Michigan Chamber of Commerce,* 494 .S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) ("The mere fact that [plaintiff] is a corporation does not remove its speech from the ambit of the First Amendment.") (citation omitted).

***22** To prevail on a retaliation claim under either the Speech or Petition Clauses of the First Amendment, a plaintiff must ultimately demonstrate by a preponderance of the evidence that: (1) he engaged in conduct protected by the First Amendment, (2) defendants then took adverse action against him; and (3) a causal connection exists between the protected conduct and the adverse action such that the former "was a motivating factor" in the latter. *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) (citing *Mt. Healthy School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283-87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If a plaintiff establishes these three elements, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse action even in the absence of the protected conduct. *Id.* (quoting *Mt. Healthy* ).

As an initial matter, Defendants contend that WIC lacks standing to bring a First Amendment retaliation claim against them because, at the time the alleged adverse action took place, WIC was neither a government employee nor an independent contractor who had an on-going commercial relationship with a governmental entity. (Def. Mem. at 8-9 n.3). In support of their argument, Defendants cite to *Umbehr,* which they claim extended the First Amendment retaliation cause of action traditionally reserved for government employees only to independent contractors with existing government contracts, and *African Trade and Information Center, Inc. v. Abromatis,* 294 F.3d 355 (2d Cir.2002), which they characterize as "declin[ing] to extend *Umbehr*" to contractors "who lacked a preexisting commercial relationship with the government." (Def. Mem. at 9 n.3).

Examining the face of the Complaint, the Court finds Defendants' lack of standing argument to be without merit. To begin with, at the time of the most recent alleged adverse action against WICnamely, the termination of the Contract and cancellation of the IRSC ProjectWIC had already executed the Contract with EDC, which, although technically not a governmental agency itself, acted as the City's agent with respect to many Project-related tasks (Compl. ¶ 69; Alper Aff. ¶ 6). Defendants fail to cite any authority holding that a contract with an agency in EDC's position does not constitute a government contract as contemplated by *Umbehr.* Further, neither *Umbehr* nor *African Trade* affirmatively prohibited an independent contractor without a preexisting commercial relationship with the government from bringing a First Amendment retaliation claim. *See Umbehr,* 518 U.S. at 685 ("[W]e need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on [pre-existing commercial relationships with the government]"); *African Trade,* 294 F.3d at 360-61 (noting that "[n]either the Supreme Court nor this Court has yet addressed that question" so that the right to bring such suit had not been "clearly established" for the purposes of the sovereign immunity defense). Moreover, at least one court within this Circuit has ruled to the contrary. *See A.F.C. Enterprises, Inc. v. New York City School Construction Authority,* No. 98 CV 4534, 2001 WL 1335010, at *17 (E . D.N.Y. Sep. 6, 2001) (concluding "that an independent contractor potentially may state a viable First Amendment Claim for retaliation where the contractor is denied a bid in retaliation for the exercise of his right to free speech").

***23** Finally, even if *Umbehr* can fairly be read to restrict standing to government employees and independent contractors with existing government contracts, this

restriction only applies to claims based on the exercise of rights under the First Amendment's Speech Clause; Petition Clause retaliation claims are frequently brought by private citizens who have no employment or contractual relationship with the governmental entity they are suing. *See, e.g., Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994) (reversing district court dismissal of Petition Clause retaliation claim brought by private property owners against municipality in which property was located for failure to enforce municipal zoning regulations); *Dougherty v. Town of North Hempstead, Bd. of Zoning Appeals,* 282 F.3d 83 (2d Cir.2002) (reversing district court's 12(b)(6) dismissal of Petition Clause retaliation claim by private property owner against municipality for denial of building permit application); *Hampton Bays Connections, Inc. v. Duffy,* 127 F.Supp.2d 364 (E.D.N.Y.2001) (denying Rule 12(b)(6) dismissal of Petition Clause retaliation claim brought by real estate developers against municipality's officials for denial of land development permit applications).

Defendants next argue that WIC's retaliation claim is clearly not based on protected First Amendment conduct. Contending that protected First Amendment activity must relate to matters of public concern, Defendants argue that WIC's lawsuits and other disputes with the City and HPD over Building rent and disrepair did not involve matters of public concern and that its lawsuits and public campaigns against the City's CURA development plans in the mid-1980's occurred too long before the alleged adverse action to form the basis of a retaliation claim. (Def Mem. at 11-16).

This argument is also unpersuasive for three reasons. First, by contending that WIC cannot establish the first element of its First Amendment retaliation claim, Defendants are essentially arguing that WIC has failed to state a claim upon which relief may be granted, which, as discussed above, is a question more appropriately dealt with in the Rule 12(b)(6) context rather than through a Rule 12(b)(1) motion asserting no substantial federal question. *See Carlson,* 320 F.3d at 306. Second, the Supreme Court case that Defendants contend requires close temporal proximity between protected conduct and the adverse governmental action, *Clark County School District v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam), involved a plaintiff who "relied solely on the temporal proximity" to establish the causality element of its *prima facie* retaliation claim, and the Court merely held that a 20-month interval between the protected conduct and adverse action "*by itself,* suggest[ed] no causality at all." 532 U.S. at 272, 274, 121 S.Ct. at 1510-11 (*emphasis added* ). In contrast, as its Complaint demonstrates, WIC attempts to establish the causal connection by alleging both a pattern of adverse actions by Defendant Perine and HPD extending over the course of several years and procedural and other irregularities in Defendants' IRSC-related decisions and activities. (*See* Compl. ¶¶ 38, 53-65, 81, 83, 87, 93, 102-105). Thus, the Supreme Court's holding in *Breeden* is inapposite.

**\*24** Third, even if WIC is precluded as a matter of law from basing its claim on its 1980's activities in opposition to CURA development, the "public concern" requirement does not apply to retaliation claims based on the Petition Clause. *See Friedl v. City of New York,* 210 F.3d 79, 87 (2d Cir.2000) ("We reject the contention ... that where the plaintiff alleges retaliation for protected speech in the form of a petition to the government, he must establish that the speech contained in his petition to the government was a matter of public concern.") (citations omitted). Moreover, seeking relief through litigation or by lodging complaints with governmental agencies is protected conduct under the Petition Clause. *See Gagliardi,* 18 F.3d at 194-95 ("The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment."); *Dougherty,* 282 F.3d at 91 (filing of civil lawsuit for denial of building permit was protected First Amendment conduct). Thus, WIC's tort lawsuits and counter-claims against the City and HPD and its numerous complaints to these entities concerning the Building's disrepair satisfy the protected conduct element of WIC's First Amendment retaliation claim.

Defendants also argue that, even if WIC's lawsuits and complaints over the Building's disrepair constitute protected First Amendment conduct, WIC cannot establish that such conduct was a motivating factor for the decision to terminate the Contract and IRSC

Project and that Defendants nevertheless would have made the same decision in the absence of such conduct. (Def Mem. at 18- 27). The problem with this argument is two-fold. First, as with their "no protected conduct" argument, Defendants are contending that WIC cannot sufficiently state one of the elements of a First Amendment retaliation claim, which is an argument more appropriately presented in a Rule 12(b)(6) motion. Similarly, in making this argument, Defendants rely almost entirely on facts contained in affidavits, affidavit exhibits, and other materials neither attached to nor incorporated by reference into the Complaint. In contrast, there is nothing on the face of the Complaint that conclusively shows there is no causal connection between WIC's protected conduct and Defendants' adverse action. Indeed, the Complaint's allegations that WIC lodged complaints with and filed lawsuits against the City and HPD over the Building's disrepair, that these complaints and lawsuits angered Perine, and that Perine and her staff subsequently engaged in activities to thwart progress on the IRSC Project and contributed to the decision to terminate the Contract and the Project form a factual basis "from which a retaliatory intent on the part of [D]efendants reasonably may be inferred," which is in turn sufficient to prevent even Rule 12(b)(6) dismissal. *Gagliardi, 18 F.3d at 195*.

Accordingly, the Court finds that WIC's First Amendment retaliation claim is substantial and therefore cannot be dismissed under Rule 12(b)(1).

3. *Equal Protection Claim*

***25*** Defendants also question the substantiality of WIC's Equal Protection claim, contending WIC cannot satisfy any of the elements of such a claim. As an initial matter, the Court notes that both individuals and organizations may assert a cause of action under the Fourteenth Amendment's Equal Protection Clause. *See Iowa-Des Moines Nat'l Bank v. Bennett, 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265 (1931)* (upholding Equal Protection claim brought by banks challenging discriminatory state taxation statute); *Metropolitan Life Insur. Co. v. Ward, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1984)* (Recognizing Equal Protection Claim brought by out-of-state insurance companies challenging state insurance statute that treated out-of-state insurers less favorably).

In alleging that Defendants subjected it to certain "unequal, retaliatory and vindictive" treatment not visited upon other Building tenants like EST because of an "irrational hostility" stemming from "past political confrontations and legal actions" (Compl. ¶¶ 3; 130-131), WIC appears to assert an Equal Protection violation based, alternatively, on the theories of "selective enforcement" and "a class of one". To prevail on a selective enforcement claim, a plaintiff "must ordinarily show (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir.1999)* (citations and internal quotations omitted); *Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir.2003)* (same).

In addition, a successful Equal Protection claim may be "brought by a 'class of one', where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Westbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)* (per curiam). However, unlike a selective enforcement claim, a "class of one" claim is dependent on the plaintiff's ability to prove not that he or she was mistreated for an impermissible reason, but merely that the defendant's reason for treating him or her differently was wholly arbitrary or irrational, regardless of defendant's subjective motivation for doing so. *Cobb, 363 F.3d at 110; African Trade, 294 F.3d at 363*.

Defendants argue that WIC's equal protection claim is insubstantial under either theory because (1) WIC is clearly not similarly situated to EST, (2) WIC cannot establish an "impermissible motive" on the part of Defendants for terminating the Contract and the IRSC Project, i.e., that WIC's First Amendment activities were a substantial motivating factor for termination, and (3) WIC cannot establish that the Contract termination

decision was not rationally-based. (Def. Mem. at 27-29). However, once again, Defendants' arguments have nothing to do with the substantiality of WIC's claim. Defendants point to facts not included in the Complaint to show that WIC and EST are not similarly situated, while a reading of the Complaint itself, which alleges that both EST and WIC were tenants of City-owned, HPD-managed Buildings in the same neighborhood that were to be renovated, suggests that the similarities in their situations were not "fictitious." Moreover, as discussed above, WIC's allegations regarding the causal connection between its First Amendment activities and Defendants' motivation for terminating the Contract and Project are sufficient to survive even Rule 12(b)(6) dismissal. Similarly, it is not "immediately obvious from the face of the complaint" that Defendants' termination decision "was so patently rational as to require no meaningful consideration." *Hagans,* 415 U.S. at 539-40.

*\*26* Accordingly, the Court also finds that WIC's equal protection claim is substantial and therefore may not be dismissed under Rule (12)(b)(1).

B. Rule 12(b)(6) Dismissal

1. *Conversion to a Motion for Summary Judgment*

When considering a motion to dismiss under Rule 12(b)(6), a court may rely only on the complaint itself, as well as any documents attached to or incorporated by reference into the complaint, *Rombach v. Chang,* 355 F.3d 164, 169 (2d Cir.2004), and such motion may not be granted unless, after viewing the complaint's allegations in a light most favorable to the plaintiff, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). Thus, because Defendants, in making their motion, rely on numerous documents neither appended to nor referred to in WIC's Complaint, Rule 12(b)(6) dismissal of Plaintiff's § 1983 claims would, under the foregoing standards, be improper. However, Defendants request in the alternative that the Court convert their Rule 12(b)(6) motion into a motion for summary judgment. (Def. Mem. at 31). Under Rule 12(b), a district court, when faced with a Rule 12(b)(6) motion to dismiss for which the matters outside of the pleadings have been presented, may treat such motion as a motion for summary judgment under Rule 56, provided that "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56," which would of course include "depositions, answers to interrogatories, admissions on file, together with affidavits." Fed.R.Civ.P. 12(b), 56(c). With respect to the issue of a reasonable opportunity to present relevant material outside of the pleadings, "[t]he essential inquiry is whether the [non-moving party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings," a question which "will necessarily depend largely on the facts and circumstances of each case." *In re G & A Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985). WIC argues that the Court cannot convert Defendants' Rule 12(b)(6) motion into a motion for summary judgment because WIC was not given notice of the possibility of such conversion or "a reasonable opportunity to present all material made pertinent to such a motion." (Pl. Mem. at 27). However, the facts of this case clearly demonstrate otherwise. For example, as early as the initial hearing on WIC's motion for a temporary restraining order on June 19, 2003, the Court, when authorizing Defendants to move to dismiss the Complaint, also ordered expedited discovery on the jurisdictional issue "so that the motion that [Defendants] make will wind up being a motion for summary judgment." (Tr. at 40-41). Moreover, WIC and the Defendants engaged in several months of expedited discovery on the very issues raised in the present motion, and WIC has in turn submitted voluminous declarations, documentary exhibits, and deposition transcript excerpts as part of its opposition to Defendants' motion. *See In re G & A Books,* 770 F .2d at 295 ("A party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in

opposition to a motion to dismiss."). Accordingly, because both parties have had a reasonable opportunity to present materials outside of the Complaint that are relevant to the issues raised by Defendants' Rule 12(b)(6) motion, the Court shall convert such motion to a motion for summary judgment.

2. *Summary Judgment Standard*

**\*27** A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir.2000).* Genuine issues of material fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." *Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir.1993)* (citing *Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).*

In assessing when summary judgment should be granted, "there must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant." *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 701 L.Ed.2d 202 (1986)).* A court must always "resolv[e] ambiguities and draw [ ] reasonable inferences against the moving party," *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986)* (citing *Anderson* ); however, the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.* at 12. Instead, when the moving party has documented particular facts in the record, "the opposing party must, 'set forth specific facts showing that there is a genuine issue for trial." ' *Williams v. Smith, 781 F.2d 319, 323 (2d Cir.1986)* (quoting Fed.R.Civ.P. 56(e)). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived " 'to put up or shut up." ' *Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir.2000)* (citation omitted). Unsupported allegations in the pleadings thus cannot create a material issue of fact. *Id.*

3. *First Amendment Retaliation Claim*

Because, as discussed in Part III.A.2. *supra,* the Court finds that WIC did engage in protected First Amendment conduct, and because by terminating the Contract, Defendants clearly did take adverse action against WIC, the sole remaining issue presented by Defendants' summary judgment motion is whether a sufficient causal connection exists between WIC's First Amendment activity and Defendants' adverse actions so that such actions may be deemed retaliatory. (*See* Def. Mem. at 16-27). Moreover, since WIC's retaliation claim arises out of the termination of the Contract and IRSC Project and is based on the theory that such adverse action stems from Defendant Perine's "irrational hatred" of WIC due to its prior First Amendment activities (*see* Compl. ¶¶ 3-4, 118), WIC can satisfy the causation element only if it establishes that (a) its First Amendment activity caused Perine to harbor irrational hostility towards and take adverse actions against it, and (b) Perine's adverse actions in turn contributed to the termination of the Contract, and with it, the IRSC Project.

**\*28** The causation element of a First Amendment retaliation claim "can be established either indirectly by means of circumstantial evidence, for example, by showing the protected activity was followed by adverse treatment ..., or directly by evidence of retaliatory animus." *Morris,* 196 F.3d at 110 (citation omitted); *Cobb,* 363 F.3d at 108 (same) (quoting *Morris* ). In terms of circumstantial evidence, retaliatory intent may be inferred from an ongoing course of adverse action by the defendant against the plaintiff. *See, e.g., Gagliardi,* 18 F.3d at 195 (holding that allegations of defendants continuous, nine-year refusal of plaintiffs' requests to enforce municipal zoning rules created inference of defendants' retaliatory intent); *Housing Works, Inc. v. City of New York, 72 F.Supp.2d 402, 426 (S.D.N.Y.1999)* ( "Evidence of a 'pattern of antagonism' or prior retaliatory conduct may serve as circumstantial evidence of retaliation.") (listing cases); *Economic Opportunity Comm'n v. County of Nassau, 106 F.Supp.2d 433, 437 (E.D.N.Y.2000)* ( "[A] plaintiff can also show retaliatory intent by establishing unequal

treatment, or an ongoing campaign of adverse action.") (citing *Housing Works* and *Gagliardi* ). Similarly, "[d]epartures from the normal procedural sequence" of governmental decisionmaking "also might afford evidence that improper purposes are playing a role," while "[s]ubstantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Village of Arlington Heights v. Metro Housing Development Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *see also United States v. Yonkers,* 96 F.3d 600, 612 (2d Cir.1996) (noting that constitutionally impermissible purposes for governmental action may be established by evidence of procedural and substantive departures in governmental decisionmaking) (citing *Village of Arlington Heights* ).

WIC contends that the current record contains several pieces of strong circumstantial evidence of Perine's retaliatory intent. Specifically, WIC points to: (a) Perine's alleged denigration of WIC and the IRSC project to EDC and Deputy Mayors Harding and Doctoroff from 1997 through 2002, (b) her alleged threat in 1999 that HPD would not support WIC's HUD funding applications unless WIC paid back rent it did not really owe, (c) her support for EST's efforts to buy the Building instead of WIC, (d) HPD's allegedly convincing the Deputy Mayor's Office to require one rather than two closings, (e) HPD's repeated refusals to commence eviction proceedings against EST, Medicine Show, and Soundscape, (f) HPD's proposal to create a new theatre space for EST, and (g) HPD's authorizing CHDC to evict WIC and the visual artist Building tenants from their temporary relocation space in the Old School Building, all of which, WIC argues, together constitute a "deeply ingrained 'pattern of antagonism' toward [WIC]." (Pl. Mem. at 30-31). In addition, WIC characterizes the delays in evicting EST, Medicine Show and Soundscape and Perine's refusal to condition HPD's offer of new permanent theatre space for EST on the latter's cooperation in relocating from the Building as "substantive and procedural departures from the normal course" on the part of Perine and HPD with respect to decisions concerning the IRSC Project. (*Id.* at 31-32).

**\*29** WIC's arguments are unavailing for several reasons. First, it is clear from the record that there was nothing procedurally or substantively irregular about HPD's refusal to commence the process of evicting the recalcitrant tenants from the Building without an MOU in place. In fact, as HPD attorney Matthew Shafit informed EDC in October 2000, and WIC does not dispute, HPD "d [id] these MOU's with other public entities when [it] perform[ed] relocation work for their projects," and HPD's proposed MOU for the Building relocation efforts was "modeled on the most recent HPDEDC Relocation MOU." (Lewitin Decl., Ex. 41). Further, HPD's insistence that funds be escrowed to reimburse it for costs incurred while trying to relocate these tenants was not unjustified, given that the CDBG funds on which EDC and WIC were relying in stating that they could pay such costs in actuality could not be used for that purpose. (*Id.,* Ex. 42).

More importantly, while much of the above-mentioned conduct on the part of Perine and HPD supports the inference that Perine did not like WIC and wanted to stop the IRSC Project, WIC has not put forth any evidence that such hostility towards WIC and the Project was due specifically to WIC's First Amendment activity. WIC points to deposition testimony of Perine, her deputy at HPD, John Warren, and HPD attorney Matthew Shafit as demonstrating that the resentment of WIC and desire to stop the Project stemmed from WIC's "petitioning to protect [its] rights as a tenant." [FN40] (Pl. Mem. at 5; Lewitin Decl. ¶ 27). Specifically, WIC cites the following excerpts from these individuals' depositions:

> FN40. The Court finds, and Plaintiffs appear to acknowledge, that WIC's litigation and other activism in the mid-1980's against the City's CURA development plans are not, as a matter of law, causally linked to the alleged adverse actions taken against WIC by Defendants because WIC's efforts occurred before Perine even began working at HPD, and Plaintiffs

have provided no evidence to show that Perine was even aware of WIC's anti-CURA development efforts either at the time she began working at HPD or when she allegedly commenced her adverse actions against WIC.

Q Do you have an opinion about the Women's Interart Center?
A Yeah. They were not a good tenant in our building. They couldn't pay rent, they illegally sublet part of their spaces.
Q Anything else that comes to mind?
A Well, you know, not paying rent and illegally subletting is not an organization that, in my opinion, is either in good standing with us, with our department, with the City, and I presume that to be incompetentlyincompetent operation, also unable to, you know, bring some consensus within the building amongst the other tenants for the plan that was-that they were proposing.
(Perine Dep. at 28-29).
Q Isn't it true that the reason that you have a problem with [WIC] is because of these issues that you've identified; the failure to pay rent, the illegal subletting and their incompetence when it came to getting consensus in the building?
A And bringing their project to fruition.
Q Isn't it true then that those basis [sic] for having problems with [WIC], you believe are rational grounds, right?
A Yes.
Q Aside from those three things, is there anything else that you're aware of about the Center, anything it's ever done, that you believe provides a rational justification for any animus you may harbor towards them? ...
A My opinion, yes, it was those three things, but I actually think I said a fourth thing, which was the inability to advance the project, which kept the building in a limbo state for an extended period of time.
***30*** (*Id.* at 79-80).
Q Okay. I assume, based on your testimony so far today, whenever asked over the years, you have expressed your opinion that the [WIC's] are a[sic] project that [sic] should not go forward, right?
A No. My opinion is, as I've stated that this was an organization that had a bad track record with us for rent arrears, for illegal subletting, all these other things, that was my opinion; and I would have been consistently expressing that opinion.
(*Id.* at 118)
Q Have you ever told anyone that it's your opinion that [WIC] would not complete its project?
A I don't recall if I told anyone that. It certainly was my opinion.
Q Why was it your opinion?
A For the same reasons that I said all [a]long, because I didn't think the organization would be able to carry it out, because if you can't pay your rent, if you can't read your lease and know whether or not you're allowed to sublet or not, these were very basic things. It didn't seem to indicate a fairly competenta fairly competent project would come to fruition.
(*Id.* at 141-142)
Q Once Ms. Perine became Commissioner [of HPD], but prior to you going over to become Deputy Commissioner of Housing Operations, did you have occasions to discuss with her or brief her in any way on issues relating to [WIC]?
A Probably
Q And during whatever first conversations you can remember having with Ms. Perine, did it become apparent to you that she had relatively strong feelings about the Women's Interart Center?
A I certainly remember discussing the fact that there was a history of nonpayment of

rent.

(Warren Dep. at 35)

Q Now it's true, is it not, within HPD, it's fairly well-known, at least at the higher levels of HPD over the last few years, that Ms. Perine does not particularly care for [WIC]? ...

A I would say she is not particularly enamored with their performance.

Q This is something that is true, is it not, that's fairly common knowledge amongst the higher level officials of HPD, it's been for some time, right? ...

A It's not a discussion that I've had with other people in the agency.

Q It's something you've been aware of but you're not aware if anyone else has.

A Again, the conversations I've had with her is sort of about their history of sort of chronic non-payers.

(*Id.* at 58-59)

Q Now, aside from this issue that we talked a bit about, withholding rent and what have you, that you associate with [WIC], was there anything else that you were aware of that contributed to the fact that Ms. Perine was not particularly enamored with [WIC]? ...

A Not that I recall.

Q That was the only thing.

A I think so.

(*Id.* at 62).

Q Prior to reading the complaint, had Ms. Perine ever expressed an opinion to you about [WIC]?

A Yes ...

Q Okay, the first time that you can recall her providing an opinion to you about her views about [WIC], what was that opinion?

***31** A The opinion was that they were not competent.

Q And did you gain any understanding as to what the basis was for her conclusion that [WIC] was incompetent?

A There were, I believe, a number of bases for that opinion. The primary thing that I remember being spoken about was the habitual failure to pay rent, and habitually making excuses for failure to meet obligations.

Q Anything else?

A With regard to their competence, no.

Q What did Ms. Perine tell you about [WIC's] failure to meet obligations?

A The specific thing that I recall ... I'm not going to use exact phrasing, but I remember talking about habitual failure to pay rent and making excuses for why the rent wasn't paid. That's what I recall.

Q So it's failing to pay rent and making excuses for doing so, meaning not paying the rent, right?

A Um-hum ...

Q When were you first involved, if at all, with any attempts to collect rent from [WIC]?

A I was aware of lawsuits against WIC. Whether I was involved with them, I don't have any recollection of being involved with them. I recall being informed of lawsuits against WIC, about very large sums being owed, although I don't remember how large. I just remember I was struck at how large they were, but I couldn't say when they were. I couldn't say whetherI couldn't say when they were.

Q. First of all, did you agree with Ms. Perine's opinion, based on what you knew? ...

A I regarded WIC, based on what I'd heard over the years as basically, a chronic dead beat on rent, a chronic non payer, that litigated against paying rent, raising things for the first time that we'd never heard about, conditions in the building. That's what I heard about WIC over the years. (Shafit Dep. at 17-20)

Q If I understand your testimony, tell me if I'm wrong, Ms. Perine has expressed to you her opinion that, one, WIC is a chronic non payer of rent; and two, that they are not a true arts organization; is that correct or not?

A That's correct.

(*Id.* at 34). Contrary to WIC's characterization, this testimony merely indicates that

Perine's negative feelings towards WIC and the IRSC Project stemmed from WIC's history of non-payment of rent, illegal subletting, and its inability to advance or gain consensus in the Building in favor of the Project, nothing more.

In fact, there is no evidence in the record suggesting that Perine herself was even aware of WIC's lawsuits or other formal grievances [FN41] against the City/HPD over the Building's disrepair prior to 2002. Indeed, Perine's first personal involvement with WIC-HPD disputes was in preparation for the February 1997 meeting to settle the 1993 non-payment/eviction lawsuit HPD had brought against WIC for the latter's significant rent arrears. (Perine Aff. ¶ 16, Perine Dep. at 24, 29). [FN42] Similarly, the so-called "timeline" of WIC's litigation with HPD, which Perine allegedly requested from her HPD staff in July of 2000, only discusses the history of HPD's non-payment proceedings against WIC and WIC's illegal subletting of its rented space in the Old School Building to Medicine Show, while making no mention of WIC's lawsuits against the City/HPD or WIC's other efforts to petition an arm of City government for redress of its grievances. (Lewitin Decl., Ex. 30). Meanwhile, HPD attorney Shafit's apparent knowledge of WIC's affirmatively litigating the Building repair issues (Shafit Dep. at 20) cannot automatically be imputed to Perine, especially since nothing in the current record indicates that Shafit ever discussed WIC's affirmative lawsuits against HPD with her. *See Long v. AT & T Information Systems, Inc.,* 733 F.Supp. 188, 205 (S.D.N.Y.1990) ("The fact that [the company for which plaintiff employee worked] received notice is not sufficient to establish a causal relationship, plaintiff must show that the person who engaged in the adverse conduct had notice of the protected activity.") (citation omitted). [FN43] Obviously, Perine could not have retaliated for First Amendment activity that she did not even know about. *See Morris,* 196 F.3d at 113 (holding that plaintiff had failed to establish the causation element of his retaliation claim because "[n]o showing was made that defendants were even aware of his [protected activity]").

FN41. In fact, aside from the allegations contained in paragraphs 10 through 14 of the Lewitin Declaration, WIC fails to provide any evidence of the pre-litigation complaints it supposedly lodged with the City/HPD concerning Building repair issues.

FN42. While WIC had originally asserted four counterclaims against the City/HPD in the 1993 lawsuit based on the Building's disrepair (*see* Weinberg Aff., Ex. F), those were resolved by a stipulation of settlement signed on June 14, 1993 (Perine Aff., Ex. H at P2622-2624). Thus, by the time Perine became involved in the case in early 1997, the only outstanding issue was WIC's subsequent default on rent arrears it had agreed to pay pursuant to a second stipulation signed by the parties on January 31, 1996, which did not condition WIC's duty to pay on repairs being made to the Building. (*Id.* at P2614-20, P2628-29). Moreover, while WIC nevertheless moved to stay eviction on such grounds, all Perine herself knew about the on-going dispute was that HPD had sued WIC because the latter still owed "significant" rent arrears. (Perine Dep. at 29-30, 32-33).

FN43. While *Long* involved a retaliation claim brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, Title VII causation standards are relevant in evaluating causation in the context of a First Amendment retaliation claim. *Azzaro v. County of Allegheny,* 110 F.3d 968, 981 (3d Cir.1997).

***32** Further, even those alleged bad acts committed by Perine in 2002 fail to establish a causal nexus between WIC's First Amendment activity and the decision to terminate the Contract and IRSC Project. Specifically, the record does not support WIC's conclusory assertion that Perine's criticisms of WIC and the IRSC Project to EDC and Deputy Mayor Doctoroff's Office in 2002 actually convinced these agencies to terminate the Contract and Project in bad faith (Pl. Mem. at 19-26). Indeed, Perine and her staff's alleged "denigration" of WIC and the Project in meetings with Doctoroff in February 2002 did not prevent the latter from deciding in March of that year to continue moving forward with the Project. (Lewitin Decl ., Ex. 73; Doctoroff Aff. ¶ 9). Moreover, WIC's contention that Perine participated in the termination decision itself is belied by the fact that at the time the termination decision was made in December 2002, she had stopped day-to-day involvement with the Project due to illness. (Perine Aff. ¶ 30; Doctoroff Dep. at 27). Similarly, WIC's reliance on Doctoroff's deposition testimony to support such contention (Lewitin Decl. ¶ 129) is misplaced since he merely testified that Perine, along with EDC, HPD and Department of Cultural Affairs staff, "supported" the decision "at the time" it was made, not that she had a hand in actually making it. (Doctoroff Dep. at 58).

In addition, the written minutes and correspondence from the July 30, August 16, September 9, and October 29, 2002 meetings involving Perine, her HPD staff, EDC, and other City Officials at most suggest that they discussed termination but would give WIC further opportunity to satisfy certain closing conditions under the Contract before a final termination decision was made. (Lewitin Decl., Exs. 88, 89, 94, 112-114). [FN44]

Finally, WIC's contentions that (1) EDC's August 23, 2002 letter to WIC imposed new closing conditions for WIC to satisfy, and (2) the reasons EDC gave for termination in its December 10, 2002 letter were "pretextual" (Pl. Mem. at 23-25) are clearly contradicted by the language of the Contract itself, whose requirements that WIC (1) make good faith reasonable efforts to relocate various Building tenants to comparable relocation spaces, (2) furnish a GMP contract for the Project and (3) sign commitments for financing sufficient to purchase and rehabilitate the Property are entirely consistent with the conditions listed in the August 23 and December 10, 2002 letters. (Collignon Aff., Exs. G §§ 4(f), 4(h), 6(k), EE, DDD).

> FN44. Indeed, WIC's unsupported, conclusory allegation that the August 16, 2002 meeting was the "official termination" meeting (Lewitin Decl. ¶ 128) does not by itself create a reasonable inference that the decision to terminate was actually made on that date. *See Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) ( "The [summary judgment] motion will not be defeated merely ... on the basis of conjecture or surmise ... The party opposing summary judgment may not rely simply on conclusory statements.").

Thus WIC is left only with HPD's authorization of CHDC's eviction proceeding against WIC in the spring of 2002, which on its own hardly constitutes "a pattern of antagonism," nor does it represent a procedurally or substantively improper decision, given CHDC's right under its license agreement with WIC to terminate the latter's occupancy of the Old School Building at any time. (Collignon Aff., Ex. Q at D 9640 §§ 1.1, 32). Moreover, by itself, this decision, which was made six years after WIC's most recent lawsuit against the City/HPD, occurred too long after such First Amendment activity to be causally connected to it. *See Breeden,* 532 U.S. at 272 (holding that adverse action taken "20 months later suggests, by itself, no causality at all"); *Morris,* 196 F.3d at 113 ("[S]ince two years elapsed between [plaintiff's protected First

Amendment activity] and his discharge, no inference of causation is justified.");
*Marinelli v. Chao,* 222 F.Supp.2d 402, 419 (S.D.N.Y.2002) (holding that four-year interval between plaintiff's protected activity and defendant's adverse action "precludes a finding of a causal connection") (citing *Morris* ).

***33** In sum, because WIC has provided "no record evidence beyond [its] bald assertions" of a causal connection between the exercise of its rights under the Petition Clause and the termination of the Contract and IRSC Project, its First Amendment retaliation claim cannot survive summary judgment. *Washington v. County of Rockland,* 373 F.3d 310, 321 (2d Cir.2004).

4. *Equal Protection Claim*

Defendants argue that WIC cannot as a matter of law satisfy any of the elements of a viable Equal Protection claim whether it is brought under a "class of one" or "selective enforcement" theory. (Def. Mem. at 27-30). As discussed in Part III.A.3. *supra,* a plaintiff proceeding under either theory must make a threshold showing that he or she has been treated differently than others similarly situated. *See Lisa's Party City, Inc.,* 185 F.3d at 16; *Village of Westbrook,* 528 U.S. at 564. While two persons do not have to be in identical situations to be "similarly situated" for purposes of the Fourteenth Amendment's Equal Protection Clause, they do have to "stand[ ] in the same relation to the government action challenged or questioned." *Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

WIC asserts that it was similarly-situated to but treated more adversely than EST, who, like WIC, was an arts organization tenant in the Building. (Compl. ¶¶ 130-131; Pl. Mem. at 35). Defendants, however, point out that, for purposes of the alleged adverse actions that are the focus of WIC's present lawsuit, the two were very differently situated. (Def.Mem.27-28).

Defendants are correct. The adverse governmental actions that form the basis of WIC's Equal Protection claim do not center on WIC's treatment as a Building tenant but instead arise out of the termination of the Contract: (1) evicting WIC from the Old School Building, while refusing to evict and/or relocate EST from the Building; and (2) sabotaging and ultimately terminating the IRSC Project in bad faith, while taking steps to provide EST with newly renovated rental space in another City-owned property within the CURA. (Compl.¶¶ 130- 131). Yet, the current record clearly reveals that, with respect to these governmental actions, WIC and EST stood in very different positions. While EST had specifically enumerated relocation and non-eviction rights under the ULURP approval of the IRSC Project (*see* Collignon Aff. ¶ 7, Ex. A at D10822-23, Lewitin Decl. ¶¶ 31, 57), WIC's license agreement under which it rented space temporarily in the Old School Building from CHDC allowed CHDC to evict it for any reason upon 30-days notice. (Collignon Aff., Ex. Q at D 9640 (License Agreement) §§ 1.1, 32). Moreover, in contrast to WIC's role in the IRSC Project as purchaser, landlord, and developer, EST was intended simply to be one of many tenants in the newly-renovated CURA Building for which HPD sought the RFP. (Lewitin Decl. ¶¶ 83-84, Warren Aff. ¶ 16).

***34** Further, as discussed in Part III.B.3 *supra,* the record before the Court clearly shows that Defendants' less favorable treatment of WIC stemmed in large part from the latter's nonpayment of rent and illegal subletting, conduct of which EST was not guilty during its tenancy in the Building. Thus, WIC has not established that Defendants' differential treatment had an irrational or otherwise constitutionally impermissible basis. Accordingly, WIC 's Equal Protection claim fails as a matter of law under either a "selective enforcement" or "class of one" theory.

IV. CONCLUSION

For the reasons stated above, it is hereby ORDERED that:

(1) Defendants' Motion to Dismiss the entire action pursuant to Federal Rule of Civil Procedure 12(b)(1) is DENIED;

(2) Defendants Motion to Dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted is converted into a Motion for Summary Judgment under Rule 56(a);

(3) Defendants' Motion for Summary Judgment is GRANTED with respect to WIC's First Amendment Retaliation and Equal Protection claims.

Accordingly, WIC's two § 1983 claims are DISMISSED WITH PREJUDICE. In addition, because these two claims formed the basis of the Court's supplemental subject matter jurisdiction over WIC's state constitutional and common law claims, the Court also DISMISSES these remaining claims WITHOUT PREJUDICE for lack of subject matter jurisdiction. *See Baylis v. Marriot Corp.,* 843 F.2d 658, 665 (2d Cir.1988) ("When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims.") (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). The Clerk of Court is directed to close the docket in the above-captioned case.

SO ORDERED

S.D.N.Y.,2005.

Women's Interart Center, Inc. v. New York City Economic Development Corp.

2005 WL 1241919 (S.D.N.Y.)

## **Motions, Pleadings and Filings (Back to top)**

- 1:03CV02732 (Docket) (Apr. 18, 2003)

END OF DOCUMENT