UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KEVIN BURNS : | CIVIL ACTION NO: |
|     Plaintiff : | 3:01CV01442(AVC): |
| : | |
| VS. : | |
| : | |
| TOWN OF SOUTHBURY AND IN : | |
| THEIR INDIVIDUAL AND OFFICIAL : | |
| CAPACITIES ALFIO A. CANDIDO, JR, : | |
| FIRST SLECTMAN; JOSEPH : | |
| FROEHLICH, CONNECTICUT STATE : | |
| TROOPER : | |
|     Defendants : | JULY 27, 2005 |

## **AFFIDAVIT OF KEVIN BURNS**

I, KEVIN BURNS, being duly sworn, depose and say:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I am the plaintiff in the above-captioned case.

3. I have been employed by the Defendant Town of Southbury Police Department ("Department") as a police officer from 1989 to present.

4. Since 1990, I have worked with Officers Duane Manville and Brian Hughes. I have approximately 18 months of seniority on each officer.

5. Throughout my tenure, the Department has employed Patrick Kenney. For several years, approximately from 1998 to 2000, Corporal Kenney served as both my supervisor and that of Officer Manville.

6. From 1998 through 2000, the Department employed approximately 17 police officers.

7. While on a day-to-day basis the Department is supervised by Connecticut State Troopers, the Town of Southbury's First Selectman is the person who has the authority over and review of investigations, discipline and grievances relating to employment with the Department.

8. Pursuant to the Collective Bargaining Agreement between the Defendant Town of Southbury and my union, American Federation of State,

County and Municipal Employees, Co. 15, ("Union"), the Defendant Town uses only two types of documents to evaluate employee performance. The first is a Performance Observation Report and the second is an annual Performance Evaluation Report.

9. The Collective Bargaining Agreement, Article 17, Reprimand Removal, permits only the retention of official reprimands, requires their removal upon request of the employee, and prohibits the use of Performance Observation Reports unless they are incorporated into an annual Performance Evaluation Report.

10. Throughout my tenure, no negative Performance Observation Reports were incorporated into my annual Performance Evaluation Reports.

11. Throughout my tenure, I have never been formally investigated or disciplined in connection with any citizen complaints and no citizen complaints ever became incorporated into a Performance Observation Report or an annual Performance Evaluation Report.

12. In 1997 and 1998, I received "very good" on my annual Performance Evaluation Reports and in 1999 received a "superior" rating. All the evaluations were signed off by Sergeant Froehlich.

13. In 1998 and 1999 respectively, Officer Manville received "very good" ratings.

14. In 1998 and 1999 respectively, Officer Hughes received "satisfactory" and "very good" ratings.

15. Throughout my tenure, I was never subjected to any formal discipline prior to the suspension of August 29, 2000.

16. On or about February 15, 1996, I requested that Mr. Candido clarify the chain of command within the Department for traffic authority functions because there was confusion as to who I would be responsible to report to. That letter is Defendants' Exhibit H. In response, Mr. Candido wrote back to me that the Connecticut State Police supervised all functions within the Department. That letter is Defendants' Exhibit I. While he insisted that I take direction from the Connecticut State Police, I was never counseled or disciplined for insubordination. Nor did I act in an insubordinate way.

17. On or about December 11, 1999, I was on patrol and arrested two Driving while Intoxicated ("DUI") suspects. At that time, the Department had a requirement that all reports be completed before the employee left his shift. In addition, under applicable state law, I was required to complete the reports of DUI arrests within 72 hours.

In keeping with those requirements, I completed my reports by going over the time for my regular shift. When I informed Trooper Clayton Brown that I required additional time, I was not told to stop. I was instead told that I would not be paid overtime for my work. At no time did I act insubordinately and I was not formally counseled by anyone in connection with my work that night.

Several days later, I requested payment for my overtime. I told Trooper Brown that the Department's policy of not paying overtime for the completion of reports was threatening DUI arrests and was contrary to the Department's requirements that employees complete reports before they completed their shift. I was simply told that I would not be paid.

18. When I was denied payment, I filed a grievance on or about December 19, 1999. In the grievance, I claimed a failure on the part of the Department to pay overtime compensation. I also challenged and was motivated by the fact that the Department's policies threatened DUI arrests and appeared to require officers to work for free in order to complete work in a timely fashion.

19. Only after I filed my grievance did Trooper Brown make any issue out of my request for compensation. He then prepared the Performance Observation Report dated January 1, 2000 referred to as Defendant's Exhibit J. That Performance Observation Report was not incorporated into my annual Performance Evaluation Report for either 1999 or 2000.

20. Throughout my tenure and up to 1997, the Department's practice had been to permit individual officers to execute arrest warrant affidavits without obtaining supervisor approval. In 1997, I received for the first time a written directive from Sergeant Froehlich which stated that I needed to obtain supervisory approval. I was not disciplined or even accused of insubordination in connection with that incident.

21. Even though we were supervised by the Connecticut State Police, I was never required to salute higher ranking State Troopers who weren't direct supervisors. Only in 1998 was I directed by Sergeant Froehlich to start saluting all officers. I was not disciplined or even accused of insubordination in connection with that incident.

22. In 1998, I was involved in a high speed chase of a DUI suspect. At some point during the pursuit, the suspect aimed his vehicle at mine. When I reported the incident, I was directed by a sergeant to end the pursuit. I did. Later on, I was able to locate the suspect without engaging in a high speed pursuit and I arrested him. When we discussed the incident at that time, Sergeant Froehlich praised me for my good police work.

23. Approximately one year later, and without warning, Sergeant Froehlich then accused me of not terminating the pursuit. While I denied it, I was never disciplined or even accused of insubordination in connection with that incident.

24. Throughout my tenure, I have consistently had the most DUI arrests in the Department, far exceeding Officers Hughes and Manville.

25. Contrary to the Defendants' claims, I have not limited my law enforcement activities to those types of arrests but have instead remained active in all areas.

26. The Department maintains records of officer activity and attached is a copy of the records for 1999 and 2000. During that time, I exceeded the activity of both Officers Hughes and Manville in all categories of crime. The records I prepared are even less detailed than those provided by Sergeant Froehlich to Mr. Candido for his review during the promotion process. Sergeant Froehlich's records would have shown the same superiority that my records show. The records for 1999 and 2000 are attached hereto as Exhibit 6.

27. When I was informed about the outcome of the promotion, I grieved the results on July 19, 2000.

28. The very next day, the incidents involving the suicidal individual occurred when I was dispatched to the steel bridge between Southbury and Newtown.

29. When I arrived on the scene, there were already officers from the Town and Connecticut State Police who were involved. Without my involvement or without my knowledge of what had happened, Trooper Clayton Brown placed the suicidal individual's sister under arrest and placed her in custody away from the scene. She was in custody and remained quiet and compliant from the time I first became aware of the arrest until I assumed control.

30. During the incident, I was specifically informed by Sergeant Mark Colangelo that he did not want the sister arrested.

31. Despite that information, I was orderd by Trooper Clayton Brown to take over the arrest and investigation of the sister. Both because I did not have information with which to arrest her and because Sergeant Mark Calangelo had issued a contradictory order, I initially refused.

32. When I initially refused, there were no operational problems with the incident and my response in no way put anyone at risk. During the 15 minute interval during which my responsibilities for the sister were clarified, she remained compliant and away from the scene.

33. Approximately 15 minutes after the sister was initially arrested and taken into custody by Trooper Clayton Brown, Sergeant Mark Colangelo changed his mind, rescinded his original order and directed me to take over the arrest and investigation of the sister.

34. When given that new order, I immediately complied and arrested the sister and took over the arrest and investigation of the sister.

35. When it became apparent that there was a misunderstanding as to Sergeant Colangelo's orders, I apologized to both him and Trooper Brown for any misunderstanding. I did not, however, apologize for or admit any insubordination since I had immediately complied when the order was clarified.

36. At no time during the incident was I insubordinate or otherwise inappropriate, defiant, or used expletives.

37. On or about August, 2000, I was informed in writing by Mr. Candido of the charges against me. After receiving that notice, however, the Town of Southbury Board of Selectman held a hearing at which Mr. Candido acted on behalf of management and recommended that I be suspended for 60 working days in connection with the incident of July 20, 2000.

38. At that hearing with the Board of Selectman, I was never given any opportunity to respond to or provide any information to rebut the presentation of Mr. Candido and I was not allowed to make any presentation of any kind.

39. On or about August 29, 2000, I was informed of the decision of the Town of Southbury Board of Selectman to suspend me or 60 working days in connection with the incident of July 20, 2000.

40. Prior to that time I was never disciplined or reprimanded for anything.

41. The penalty that I was given far exceeded that given to any other officer for any similar accusation of insubordination or for any other offense.

42. For example, in 1997, the Town suspended Officer Frank Tierney for 5 days for insubordination and 5 days for defacing Town property for refusing a direct order to remove painting from his helmet that included a shamrock and the statement "born to kill."

43. On or about September 7, 2000, the Town suspended Officer George Slaiby for 4 days for investigating a case in which a relative was the suspect and in which he had a personal conflict of interest. On the same day, he was also demoted for a second disciplinary incident for failing to properly respond to a 911 hang-up call which resulted in the death of the caller.

44. While I was the Union's Vice President, I filed more than 6 allegations of violations of Connecticut labor law with the State of Connecticut Department of Labor Board of Mediation and Arbitration ("Labor Board").

45. Some of those charges with the Labor Board included a complaint on September 3, 1999, that the Town of Southbury had engaged in "bad faith bargaining by not responding to grievances submitted by the union." Exhibit 10.

46. In late 1999 or early 2000, I filed two other complaints with the Labor Board because the Town had failed to comply with a grievance settlement and had unilaterally ceased a past practice. Exhibit 11; Exhibit 12.

47. Again in March, 2000, I filed a complaint with the Labor Board that the Town's subcontracting of bargaining unit work was "hindering its employees from continuing to bargain collectively" and was an attempt to "disband and eliminate the union." Exhibit 13.

48. In addition to the charges of bad faith bargaining and unfair labor practices, I also filed at least 12 grievances for myself and on behalf of the union.

49. For example, on or about March 9, 1998, I filed a grievance regarding the Department's policy requring officers to complete reports on computers located in the station rather than permitting them to complete them by hand in the field, in part, because such a practice impacted public safety by reducing patrolling officers.

50. On or about June 25, 1999, I filed a grievance regarding the Department's payment policies for private duty jobs, in part, because the Department's pay policies would deter officers from taking such work and would impact public safety by leaving construction or road sites unattended.

51. On or about December 16, 1999, I filed a grievance regarding the Department's practice of using emergency pagers for routine communication, in part, because such a practice impacted public safety by preventing the proper use of such pagers for real emergencies and promoting officers in ignoring pager calls.

52. On or about January 4, 2000, I filed a grievance regarding the Department's failure to properly notify officers of schedule changes, in part, because the practice resulted in the waste of taxpayer money by requiring overtime compensation to cover shift changes.

53. The foregoing is true and accurate to the best of my knowledge and belief.

_____
Kevin Burns

Subscribed and sworn to before me this 27th day of July, 2005.

_____

Notary Public
My Commission Expires

## **CERTIFICATION**

      I hereby certify that a copy of the foregoing has been mailed this ___ day of July, 2005, to the following parties:

James M. Sconzo
Halloran & Sage
One Goodwin Square
225 Asylum Street
Hartford, CT  06103

                                                              _____
                                                              Marc P. Mercier

Burns\pleadings\AffBurns07-05pld.doc