Case 3:01-cv-01442-AVC   Document 106-12   Filed 07/29/2005   Page 1 of 11
Burns vs. Town of Southbury
4/12/2005                                                    Joseph Froehlich

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



\* \* \* \* \* \* \* \* \* \* \* \* \* \*
KEVIN BURNS,                    )
                                )
            Plaintiff,          )
                                )   Civil Action No.
     -vs-                       )   3:01CV1442 (AVC)
TOWN OF SOUTHBURY;              )
ALFIO CANDIDO, JR., FIRST       )
SELECTMAN, et al.,              )
                                )
            Defendants.         )
\* \* \* \* \* \* \* \* \* \* \* \* \* \*

     Deposition of JOSEPH FROEHLICH, taken before
Bethany A. Carrier, a Court Reporter and Notary Public
within and for the State of Connecticut, pursuant to
Notice and the Federal Rules of Civil Procedure, at the
offices of Beck & Eldergill, 447 Center Street,
Manchester, Connecticut, taken on April 12, 2005,
commencing at 9:55 a.m.

            Bethany A. Carrier, LSR 071
            Brandon Smith Reporting Service
                 44 Capitol Avenue
            Hartford, Connecticut  06106
                   (860) 549-1850

1   police chief.

2       Q   Well, you said that you were responsible to
3   report to the lieutenant.

4       A   That's correct.

5       Q   And that you did not have responsibility to
6   report to town officials.

7       A   That's correct.

8       Q   If that's the case, I'm wondering what was
9   your understanding of the role of police chief if he
10  has no authority over the chain of command within the
11  department?

12      A   Well, he has authority within the
13  constabulary to give discipline to the town officers
14  who are employed by the town.

15      Q   All right.  So he would have authority as the
16  chief of police to discipline your town subordinates?

17      A   Correct.

18      Q   And your discipline or review of your
19  performance would be internal to the Connecticut State
20  Police?

21      A   That's correct.

22      Q   All right.  Did the chief of police have any
23  disciplinary authority over you at all?

24      A   No, he did not.

25      Q   Did anybody on the board of selectmen have

Case 3:01-cv-01442-AVC   Document 106-12   Filed 07/29/2005   Page 3 of 11

Burns vs. Town of Southbury
4/12/2005                                                          Joseph Froehlich

Page 15

1  administering the collective bargaining agreement that
2  existed with respect to the International Brotherhood
3  or the precursor?
4       A    No.
5       Q    Were you involved at all in administering the
6  collective bargaining agreement that was negotiated by
7  Council 15?
8       A    I had input into the operational issues that
9  were presented by the union.
10      Q    And what do you mean by you had input into
11 the operational issues?
12      A    The labor attorney would ask my position on
13 certain types of proposals that were being made by the
14 union to change either rules or regulations or how they
15 were to do their day-to-day operations.
16      Q    And did you have any role in terms of
17 administering grievances that were filed under the
18 contract negotiated by Council 15?
19      A    Yes, I did.
20      Q    What role did you have?
21      A    I would be the first step in the grievance
22 procedure.  If a police officer had a grievance, they
23 would present that grievance to me.
24      Q    All right.  And then from there where did it
25 go?

Case 3:01-cv-01442-AVC   Document 106-12   Filed 07/29/2005   Page 4 of 11
Burns vs. Town of Southbury
4/12/2005                                                    Joseph Froehlich

Page 16

1   A   It would depend. If it was resolved, it was
2   resolved at Step 1. If it was not resolved at Step 1,
3   it would be forwarded to the first selectman's
4   office.
5   Q   Do you know how many steps there were?
6   A   I believe there were four, but I'm not
7   certain.
8   Q   So your only direct involvement was in Step
9   1?
10  A   Yes.
11  Q   In administering Step 1, did you coordinate
12  with the first selectman or the town in terms of a
13  response?
14  A   No. I gave my response, and after that I
15  forwarded it to the first selectman for his response.
16  So I'm not sure what you mean by coordinate it.
17  Q   Well, did you discuss with the first
18  selectman or any representative of the town how to
19  respond to a grievance prior to issuing your Step 1
20  response?
21  A   No, I never told him how to respond.
22  Q   No, no, I'm asking did they tell you how to
23  respond?
24  A   Oh, no. That was my decision.
25  Q   So it's your testimony that that was a

Page 32

```
1   report or a performance evaluation report or the
2   training certificates, are there any other documents
3   that relate to someone's performance?
4       A    That's it.
5       Q    All right.  And if you can recall, what were
6   the performance observation reports that were prepared
7   on Mr. Burns prior to December of 1999, if you can
8   recall?
9       A    I can't recall every single one that was
10  performed.
11      Q    Can you recall any of them that stick out in
12  your mind?
13           MR. STERLING:  Objection.
14      A    No, I can't.
15  BY MR. MERCIER:
16      Q    Were any of them critical of him?
17      A    I don't recall.
18      Q    Now, as the supervisor, you were responsible
19  to evaluate performance?
20      A    That's correct.
21      Q    And what did you do to go about evaluating
22  performance?
23      A    I should clarify that as a supervisor, there
24  was delegation to corporals and other members who were
25  involved in the evaluation.  So I would not necessarily
```

Case 3:01-cv-01442-AVC   Document 106-12   Filed 07/29/2005   Page 6 of 11

Burns vs. Town of Southbury
4/12/2005                                                               Joseph Froehlich

Page 49

```
 1    A    No, he didn't.
 2    Q    And do you know why?
 3    A    The only information that I received from
 4  Trooper Skibek was a note back saying he contacted this
 5  woman, she did not want to provide a written statement,
 6  and that again, she was fearful of -- she lives in the
 7  town, she goes to certain establishments and did not
 8  want to offend any police officers by complaining
 9  against them.  So the matter at that point was
10  dropped.
11    Q    Okay.  Did you discuss Mr. Diamond's
12  complaint or the female's complaint with Officer Burns
13  directly?
14    A    I don't believe I did, no.
15    Q    All right.  Did you ever discuss this
16  complaint with Mr. Candido?
17    A    I don't believe I did.
18    Q    Were these incidents, would they be part of
19  the notes that you kept?
20    A    Yes, they would.  The letter from the
21  attorney and the response from Trooper Skibek.
22    Q    Did Mr. Candido ever ask you for a copy of
23  your notes or your file?
24    A    No, he didn't.
25    Q    Did you ever provide him a copy?
```

Case 3:01-cv-01442-AVC   Document 106-12   Filed 07/29/2005   Page 7 of 11
Burns vs. Town of Southbury
4/12/2005                                          Joseph Froehlich

Page 57

1  been submitted to a sergeant at the troop for review.

2  And that was in direct -- directly contrary to a memo I

3  had put out that all warrants should come to me. The

4  individual officer who submitted that arrest warrant to

5  the troop was in the field training program. So when I

6  spoke to that officer, he advised me that Kevin Burns

7  had told him to go over and to bring the arrest warrant

8  to a troop supervisor. So I spoke to Kevin's

9  supervisor and made sure that Kevin understood the

10 protocol that all arrest warrants should come to me.

11         So his supervisor at the time, I'm not sure

12 who it was, was asked to counsel him with regards to

13 following correct procedures for submission of arrest

14 warrants.

15    Q   Okay. Did you discuss that directly with Mr.

16 Burns?

17    A   I did not. I spoke to his supervisor.

18    Q   And did you ever discuss that topic with Mr.

19 Candido?

20    A   No, I didn't.

21    Q   Any other incidents you can recall in '97?

22    A   Again, in that same June of 1997, I was

23 reviewing a report and I noted that Kevin Burns had

24 made an arrest for a DWI when, in fact, he had with him

25 a recruit or a new police officer who by that time in

Case 3:01-cv-01442-AVC    Document 106-12    Filed 07/29/2005    Page 8 of 11

Burns vs. Town of Southbury
4/12/2005                                                                Joseph Froehlich

Page 63

1      Q    Yes.

2      A    No.  That was my only time in my four and a

3  half years that I ever received that kind of

4  complaint.

5      Q    Did you ever discuss this complaint with Mr.

6  Candido or anybody from the town?

7      A    No, I didn't.

8      Q    Now, you said that there was a second

9  incident in June '97 involving the DUI arrest.  Were

10 there any other incidents in 1997 that come to mind?

11     A    1997, in November I talked about the Arnold

12 case.

13     Q    Right.

14     A    Prior to the actual complaint coming forward,

15 and that was around January of 1998, this occurred

16 let's say on a weekend, I believe, Corporal Kenney, who

17 was Kevin's supervisor, came to me either the next day

18 or a day or two after this situation and before the

19 Arnold family contacted the first selectman about a

20 complaint and stated that he had concerns about Kevin's

21 behavior at the scene, not towards the Arnold family,

22 but towards a supervisor who came out and made a

23 decision not to tow the vehicle that was involved.  I

24 believe it was Sergeant Nihill was the supervisor.  And

25 Corporal Kenney was relating to me that Kevin was not

Case 3:01-cv-01442-AVC   Document 106-12   Filed 07/29/2005   Page 9 of 11

Burns vs. Town of Southbury
4/12/2005                                                      Joseph Froehlich

Page 73

1  agreed that the state police radio would first be
2  utilized and then the town radio system, because again,
3  he is in charge of paying for and having that equipment
4  installed, but he also has to know what it's being used
5  for.
6       Q    Other than a general discussion with him
7  about the purchase of equipment and the protocol, did
8  you discuss with Mr. Candido the specific incident
9  involving Mr. Burns?
10      A    I don't believe I did.  I can't recall.
11      Q    Any other incidents in '99, other than the
12 one in March of '99 and then the one from December '99
13 involving Trooper Clayton Brown?
14      A    That's the best that I can recall.  There
15 were only those two or three incidents in '99.  I'm
16 just trying to think if there was any others.  That's
17 it.
18      Q    All right.  Now, did any of these incidents
19 that you just relayed to us, did any of those become
20 part of Kevin's performance evaluation reports?
21      A    No, they didn't.
22      Q    Why not?
23      A    Well, in most of the situations the
24 supervisors who observed this had the responsibility to
25 take and decide how they're going to document it.  In

Page 85

1   A   No.

2   Q   What was your involvement in the creation of
3   the oral part?

4   A   Again, I created the oral questions.

5   Q   Did Mr. Candido have any input into the
6   creation of the oral questions?

7   A   No, he didn't.

8   Q   And then you said that you -- withdrawn.
9       Did you consult with the union in terms of
10  creating the oral questions?

11  A   No, I didn't.

12  Q   All right.  Now, you said the last portion of
13  it was a 20 percent granted to PORs, PERs and training
14  and experience?

15  A   Correct.

16  Q   And did you provide to Mr. Candido any
17  guidance on what you meant by training and
18  experience?

19  A   No.

20  Q   Did you have any discussion with Mr. Candido
21  at all about what that criteria training and experience
22  was intended to mean?

23  A   The one document that I do recall providing
24  to him was a spreadsheet of about four years of
25  activity that each of the candidates did that would

Case 3:01-cv-01442-AVC   Document 106-12   Filed 07/29/2005   Page 11 of 11
Burns vs. Town of Southbury
4/12/2005                                                      Joseph Froehlich

Page 97

1  28 what each one was for, whether they were a burglary.
2  If you look at this particular form you can get a sense
3  of what types of cases Corporal Gugliotti may have
4  investigated. It may have been all burglaries or maybe
5  it was a variety of cases. So the spreadsheet that I
6  created was a breakdown of those cases.
7     Q   All right. So it contained a further detail
8  of the types of cases that would be under the column
9  criminal investigations?
10    A   Correct.
11    Q   And did it contain any other additional
12 information on the accident investigations portion?
13    A   It may have had a column for DWIs and
14 accidents as well, just to supplement the criminal
15 investigations.
16    Q   All right. And where did you come up with
17 the idea to provide that additional information to Mr.
18 Candido?
19    A   That was something that I thought would
20 demonstrate a candidate's experience on the types of
21 cases that they handled when they were assigned to the
22 resident troopers office for that four-year period I
23 was there.
24    Q   All right. And is that an idea that you
25 created yourself or did you get it from some other