```
         UNITED STATES DISTRICT COURT
            DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - - X
KEVIN BURNS,
                    Plaintiff,
     VS.                             10/26/04
                                     CIVIL ACTION NO.
                                     3:01CV1442(AVC)
TOWN OF SOUTHBURY, AND IN THEIR INDIVIDUAL
AND OFFICIAL CAPACITIES, ALFIO CANDIDO, JR.
FIRST SELECTMAN; JOSEPH FROEHLICH, CONNECTICUT
STATE TROOPER
                    Defendant.
- - - - - - - - - - - - - - - - - X


          DEPOSITION OF ALFIO CANDIDO, JR.

     Deposition of Alfio Candido, Jr. on behalf of the
Plaintiff, pursuant to Notice and Section 242 et seq. of
the Practice Book, before Nancy A. Richmond, Court
Reporter, a Notary Public, duly qualified within and for
the State of Connecticut, on October 26, 2004, commencing
at 10:15 a.m., at the offices of James S. Brewer, 818
Farmington Avenue, West Hartford, Connecticut.



          BY: NANCY A. RICHMOND, LSR

             A+ REPORTING SERVICE
                 P.O. Box 831
              WALLINGFORD, CT 06492
           TELEPHONE: (866) 369-9976
```

A P P E A R A N C E S

FOR THE PLAINTIFF:

LAW OFFICES OF JAMES S. BREWER

    BY: ATTORNEY ERIN I. O'NEIL-BAKER

818 Farmington Avenue

West Hartford, CT 06119


FOR THE DEFENDANTS:

LAW OFFICES OF HALLORAN & SAGE, LLP

    BY: ATTORNEY KEVIN R. BRADY

One Goodwin Square

225 Asylum Street

Hartford, CT 06103

---

3

S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties that all formalities in connection with the taking of this deposition including time, place, sufficiency of notice, and the authority before whom it is being taken may be and the same are hereby waived;

    IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that the reading and signing of the deposition by the deponent are not waived;

    IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties that all objections except as to form are reserved to the time of the trial.

---

4

1            A L F I O   C A N D I D O,   J R.
2  called at the request of the Plaintiff, being of lawful age
3  and having been first duly sworn in the above cause deposed
4  on his oath as follows:
5
6          D I R E C T   E X A M I N A T I O N
7
8  BY MS. O'NEIL:
9    Q    Good morning Mr. Candido?
10   A    How are you?
11   Q    Hi. I'm the attorney for the plaintiff, Kevin
12  Burns in this action. Could you please state your name and
13  address for the record, please?
14   A    Sure. Alfio, A-L-F-I-O, A. Candido, C-A-N-D-I-
15  D-O. Address is 141 Jeremy, J-E-R-E-M-Y, Swamp Road,
16  Southbury.
17   Q    Okay. I'm just going to go through a few
18  guidelines for the depositions. It's important that
19  everything that you say is audible so the court reporter
20  can take down everything that you say. Do you understand
21  that?
22   A    Yeah, I understand.
23   Q    Okay. If you don't understand a question that I
24  have asked you, it's important that you tell me you don't

1  Q   And were you aware that the exam would be
2  composed of a written test worth forty percent, an oral
3  test worth forty percent, and that training, experience,
4  PORs and PERs would make up twenty percent?
5  A   Yes.
6  Q   What is a POR?
7  A   Personnel, yeah.
8  Q   What's the -- excuse me, I'm sorry.  What's a
9  POR?
10 A   POR, yeah.
11 Q   What does that stand for?
12 A   That's part of the records of the personnel
13 itself.
14 Q   So PORs are the documents that are found in the
15 personnel file?
16 A   Yes, Ma'am.
17 Q   And would that include evaluations and any type
18 of discipline?
19 A   Possible.
20 Q   Would it include commendations or awards?
21 A   I would -- I don't know if they're in there or
22 not.
23 Q   And where is that personnel file kept?
24 A   Administrative assistant keeps them.

1  Q   Is that in your office?
2  A   In her office.
3  Q   But it would be your administrative assistant?
4  A   Right.  Either there or in the controller's
5  office, the physical office.
6  Q   Are there more than one personnel file?
7  A   Are there more than one?
8  Q   Yes.
9  A   Just the PORs, the PERs, yeah, that's all.  Those
10 are the files, yes.
11 Q   Okay.  So POR is a specific file?
12 A   Yes.
13 Q   And PER is another file?
14 A   Evaluation, yes.
15 Q   Okay.  That twenty percent that is detailed in
16 Exhibit 3 that is made of up training, experience, PORs and
17 PERs, is that a score that you as first selectman would
18 provide?
19 A   That ended up being what I did help provide, yes.
20 Q   So you would make up that score that goes towards
21 that twenty percent?
22 A   Yes.
23 Q   Did anyone assist you in making up that score?
24 A   The sergeant.

43

1  Q   That would be Sergeant Froehlich?
2  A   Froehlich.
3  Q   And what did you do to make up that score to --
4  I'm sorry.  What did you do in creating that score?
5  A   How I evaluated the individual candidates.
6  Q   And you would do that, and how would you evaluate
7  those candidates?  Did you review anything?
8  A   Whatever was available plus my knowledge of the
9  individual candidates.
10 Q   Your own personal knowledge?
11 A   Yes, Ma'am.
12 Q   For the 2000 promotional exam did you review the
13 personnel files of those candidates?
14 A   I don't know if I did at this time.  I know I had
15 seen the files at different times, but I don't know if I
16 did at that time.
17 Q   In making up that score for each of the
18 candidates was Sergeant Froehlich in the room with you as
19 you made up those scores?
20 A   I'm sure -- it was always discussion with him.
21 Q   Okay.
22     MS. O'NEIL:  Do you want to take a five-
23     minute break?
24     MR. BRADY:  Sure.

44

1     (WHEREUPON, There was a brief recess off
2     the record.)
3  BY MS. O'NEIL:
4  Q   You know what I forgot to ask you?  I forgot to
5  ask you if you've ever been deposed before.  Have you ever
6  been deposed before?
7  A   I think once.  I don't remember why.  I think,
8  yeah.  Some place.  I think it was your office or someone's
9  office.  I think once.
10 Q   Have you ever testified in a court before?
11 A   Never.
12 Q   Okay.  Have you ever testified at a hearing
13 before?
14 A   At hearings, yes.
15 Q   How many hearings have you testified at?
16 A   Probably two.  I don't know.  I don't know, two
17 or three.
18 Q   Do you recall testifying at the hearing regarding
19 the promotion of Officer Burns?
20 A   Yeah.  I -- yeah.  That's why I said I think
21 there was two.
22 Q   Do you recall what the other one was?
23 A   I guess they were probably the same issue.
24 Q   Have you ever been a party to a lawsuit before?

46

1  A   Oh, yes.
2  Q   Okay. How many times have you been a plaintiff
3  in a lawsuit?
4  A   I don't know as I've ever had the opportunity.
5  Q   Okay. How many times have you been a defendant?
6  A   1970s I was sued about umpteen times when I was
7  chairman of zoning. I never went to court. We had a
8  moratorium in Southbury, the one and only in the state and
9  I was sued every evening with a summons.
10 Q   After you were chairman of zoning have you been a
11 defendant in any lawsuits?
12 A   No.
13 Q   Is this the only one?
14 A   Yeah.
15 Q   This Burns lawsuit?
16 A   Yep.
17 Q   Do you recall testifying at the hearing in front
18 of the Department of Labor Board of Mediations that you did
19 not review any personnel files before making your
20 assessment for that twenty percent for the 2000 promotion?
21 A   For the 2000 I believe that's true.
22 Q   Okay.

1  A   I guess so. I had -- I'm aware of the previous
2  testing, so I get them confused. But I think that's
3  probably right.
4  Q   Okay. So you were explaining how to prepare and
5  come to that score that makes up that twenty percent. And
6  you stated that based on your knowledge of that person,
7  based on your knowledge of the candidate you make an
8  evaluation of that individual; is that correct?
9  A   That's what happened, yes.
10 Q   And you stated that you couldn't recall whether
11 Froehlich was present when you made up that score?
12 A   I'm almost certain he was there but.
13 Q   For the 2000 promotional exam who were the
14 candidates?
15 A   Burns, Hughes, and Manville.
16 Q   And who did you promote to corporal?
17 A   Hughes.
18 Q   Do you recall what score you gave Hughes to make
19 up that twenty percent?
20 A   I don't remember now, no. I know -- no, I don't
21 remember now.
22 Q   How about Manville? Do you remember?
23 A   I don't remember that.
24 Q   Do you recall what you gave Burns?

47

1  A   Definitely.
2  Q   What did you give Burns?
3  A   Six.
4  Q   And is that out of twenty?
5  A   That was from zero up.
6  Q   So out of a possible twenty you gave him a six?
7  A   I gave him a six, yeah.
8  Q   Okay. When were you made aware that the corporal
9  promotional exam would take place in June of 2000? Well,
10 I'll withdraw that question. How were you made aware of
11 the time and date that the corporal exam would take place?
12 A   In June?
13 Q   Yes.
14 A   Of 2000? I thought it was in April.
15 Q   Yes. If you look at Exhibit 3, that's the
16 posting; is that correct?
17 A   Right, yeah.
18 Q   Is that the first knowledge you had of when the
19 exam would take place?
20 A   I think so, yeah. Well, maybe it was discussed
21 we would consider it in -- yes, there was talk about
22 considering it.
23 Q   Okay. Considering the date?

48

1  A   The date and the fact that we would even do it.
2  This is four and a half years ago. Yeah, I guess. We
3  certainly discussed it.
4  Q   Okay. So the candidates took a written exam?
5  A   Right.
6  Q   Is that correct?
7  A   Yes.
8  Q   And then they took an oral exam; is that correct?
9  A   Yes.
10 Q   And do you know how --
11     MS. O'NEIL: Let's make this Exhibit 4.
12     (WHEREUPON, Plaintiff's Exhibit No. 4 was
13     marked for identification.)
14 BY MS. O'NEIL:
15 Q   Okay. I'm handing you Exhibit 4. If I could
16 review those three pages that make up Exhibit 4 and let me
17 know when you're done?
18 A   Let's start. I -- you know.
19 Q   Okay. You've reviewed these documents?
20 A   I've seen them now, yeah.
21 Q   Okay. Have you seen these documents before
22 today?
23 A   Some other time, yeah.

1    A   Yes.
2    Q   Okay. Do you recall testifying at the labor
3 board that Officer Burns was an exceptional officer?
4    A   That I said he was?
5    Q   Yes.
6    A   He was a good officer.
7    Q   Do you recall testifying that he was an
8 exceptional officer?
9    A   It might have been words put in my mouth but I
10 don't know.
11    Q   Okay. I'm going to read you and excerpt from the
12 transcript taken from the Department of Labor on September
13 23rd, 2004.
14        MS. O'NEIL: And I can make a copy of this.
15        We'll make this Exhibit 5.
16        MR. BRADY: Are you going to mark the
17        entire transcript or just a page?
18        MS. O'NEIL: I was just going to mark the
19        page if that's okay with you, the front page and
20        then this.
21        MR. BRADY: Yep.
22        MS. O'NEIL: We'll make this Exhibit 5 and
23        I'll just make copies right now.

1        (WHEREUPON, Plaintiff's Exhibit No. 5 was
2        marked for identification.)
3        MS. O'NEIL: We'll just go off the record
4        and I'll make copies.
5        (WHEREUPON, There was a brief recess off
6        the record.)
7 BY MS. O'NEIL:
8    Q   You just testified that you thought Officer Burns
9 was a good officer; is that correct?
10        MR. BRADY: Objection to the form. You can
11        answer.
12    A   I think -- and I don't remember exactly what I
13 said, but something to the fact that as far as DWIs he was
14 an exceptional officer. If I did say anything that was in
15 reference to the one area.
16    Q   He excelled at DWI arrests?
17    A   Oh, goes without saying.
18    Q   Yeah.
19    A   I think my statement was, "You could see it in
20 the newspapers daily."
21    Q   And when you were creating the POR score, that's
22 what I'll refer to it, as the POR score, the twenty
23 percent, did you consider his DWI arrests?
24    A   Yes.

               59

1    Q   Okay. What else did you consider in making his
2 POR score?
3    A   The many incidents that the sergeant continuously
4 brought forward during that period of time when it was my
5 responsibility to come up with a score. There was daily
6 issues that or incidents that the officer was involved in
7 with the department.
8    Q   So was this prior to you sitting down with
9 Sergeant Froehlich that he would come in on a daily basis?
10        MR. BRADY: Objection to the form.
11 BY MS. O'NEIL:
12    Q   I'll withdraw that question.
13    A   Okay.
14    Q   You said when you were creating the POR score you
15 sat down with Froehlich?
16    A   Daily we would discuss it, yes.
17    Q   Okay. You testified that when you were creating
18 the POR score for Officer Burns, you sat down with
19 Froehlich with him and discussed Officer Burns; is that
20 correct?
21    A   I believe so.
22    Q   Okay. When you specifically sat down with
23 Sergeant Froehlich to create that score, was that more than
24 one occasion or just one occasion?

               60

1    A   More than one occasion.
2    Q   All right. Do you have notes of those meetings?
3    A   No.
4    Q   When you sat down with Sergeant Froehlich, did
5 you say: I would like to discuss Officer Burns, when
6 creating this POR score?
7    A   No.
8    Q   Okay. How would you discuss the issue with
9 Sergeant Froehlich?
10    A   Of the candidates?
11    Q   Correct.
12    A   Usually when he came in, he would discuss day-to-
13 day incidents and maybe hashed out things that have
14 happened and you know, yesterday, day before, last year. I
15 mean all those things keep repeating. It's just the way it
16 is.
17    Q   Okay. So he would come in to you, and this was
18 on a daily basis he would come in and talk to you about
19 incidents --
20    A   Officer's incidents, officer's in the
21 association, you know, vehicles, whatever.
22    Q   Okay. And when did these meetings take place?
23 Did they take place between April and June of 2000 or prior
24 to April?

1  Q    And when you presented the suspension to the
2  board, what did you do as part of that presentation?
3  A    I made the presentation to the board as
4  determined by counsel, myself, and the sergeant, and
5  lieutenant.
6  Q    And what lieutenant was that?
7  A    I think at the time it might have been Chambliss.
8  Q    Was an Internal Affairs investigation done
9  against Officer Burns regarding this incident?
10 A    Yes.
11 Q    Or was it an administrative investigation?
12 A    Oh, I don't know which it was called.
13 Q    Okay.
14 A    But there was an investigation. The
15 investigation was requested by the lieutenant after he had
16 discussed it with the captain and the major on up. And it
17 was -- but you know, whether it was administrative,
18 internal I don't know.
19 Q    Is there a difference between those two types of
20 investigations?
21 A    I'm sure there is but I don't know what they are
22 right now. I'm not certain.

1  Q    Did you know that an administrative investigation
2  can only result in a written reprimand and not a
3  suspension?
4  A    I -- I'm not aware of that.
5  Q    Did the board have to vote for any suspension
6  longer than thirty days?
7  A    Yes.
8  Q    And did the board vote?
9  A    Yes.
10 Q    And what was that vote?
11 A    Unanimously. It was my request sixty days and
12 not to be fired. The same with the board of finance.
13 Board of finance and board of selectman didn't necessarily
14 agree with me.
15 Q    So it was your request that Officer Burns be
16 suspended for sixty days?
17 A    That's right, and not be fired.
18 Q    And whose recommendation was it that Officer
19 Slaiby be suspended for four days?
20 A    For five days.
21 Q    For five days?
22 A    You said four but I think it's five.
23 Q    Okay, we'll go with five.
24 A    I'm not certain.

123

1  Q    Who recommended that suspension?
2  A    I don't know whether it was the sergeant or the
3  counselor where it came from.
4  Q    Did you recommend that five days?
5  A    Did I go along with the five days?
6  Q    Did you recommend it?
7  A    I don't remember who recommended it.
8  Q    Did you approve of that five-day suspension?
9  A    It ended up being five days and a demotion from
10 corporal to private.
11 Q    And that was for failure to respond which
12 resulted in the death of a woman?
13 A    Failure on his to accept -- not that he didn't
14 respond. Someone responded but it wasn't an officer that
15 responded. He relied on the security response.
16 Q    And it resulted in the death of a woman; is that
17 correct?
18      MR. BRADY:  Objection to the form.
19 A    I don't know if that was the reason.
20 BY MS. O'NEIL:
21 Q    Not the reason, but did that happen?
22 A    That was the end result.

124

1  Q    Okay. Have you ever suspended -- have you ever
2  recommended a suspension of any other officer besides
3  Burns?
4  A    Yeah. They enlightened me somewhere along the
5  line that I suspended Officer Tierney.
6  Q    Do you know how long you recommended a suspension
7  for him?
8  A    I guess it was ten days.
9  Q    And what was that for?
10 A    One thing I do remember was something about a
11 clover leaf on his helmet. That seemed to be one of the
12 issues, helmet that was issued.
13 Q    Was it also for insubordination?
14 A    I'm not certain if that was the call, but the
15 reason was that he had put clover leaves on his helmet if I
16 remember. And I think there might have been felt clover
17 leaves or something.
18 Q    And was he ordered to take them off?
19 A    I believe so.
20 Q    And he did not?
21 A    I believe so.
22 Q    Okay. So that would be insubordination?
23 A    It could be. Probably was insubordination.